## A92A0898. ROBB v. CSX TRANSPORTATION, INC.
(420 SE2d 370)

McMurray, Presiding Judge.

On November 21, 1989, plaintiff brought suit against defendant seeking damages for a hearing loss injury under the Federal Employ-

ers' Liability Act ("FELA"), 45 USC § 51 et seq. Defendant answered the complaint, denying liability and asserting, inter alia, a statute of limitation defense. Following discovery, defendant moved for summary judgment. The trial court granted the motion, ruling that plaintiff's suit was time barred as a matter of law. Plaintiff appeals. *Held*:

In his deposition, plaintiff testified as follows: "Q. When is the first time you noticed any kind of problem with your hearing? A. Early in the last decade, I noticed my ears ringing at times. Q. When you say the last decade, are you talking about the 1980's? A. Yes. Q. So it would have been in the early 1980's? A. Yes. Q. Was there any particular times when you notice your ears ringing? A. Yeah, I can recall several different events, occurrences. . . . There was one occasion back around 1980 when I had to run a train a long distance with a horn stuck, blew for 50 miles and several hours. Just early in '87, a pop-off valve blew close to my face. All of those were painful and traumatic. Q. Were you ever exposed to car retarder noises, say, before 1980? A. Yes. Q. Do you remember there being occasions when that would leave your ears ringing or there would be a period of time afterwards where you weren't able to hear as well? A. Yes. Always for a short time after a loud noise, your hearing suffers and your ears ring some. . . . Q. That incident where the horn stuck, did you see any doctor about that afterwards? A. No. Q. How long did your ears ring after that? A. That was several days. That was one of the more traumatic things that happened that I recall over the years. Q. Aside from ringing, were you not able to hear as well for a few days? A. Yes. Q. And that was what, 1980? A. Approximately '79 to '80. Q. Did you make out any kind of an accident report or incident report regarding that? A. No, not that I remember. I didn't know that I was injured. I just thought that I was exposed to some noise there and it would wear off. It's like getting cut or scraped, you know, things heal. Q. When did you first notice that you couldn't hear as well in a room where there was more than one person talking? A. '86 or '87, become increasingly aware of it. Q. Was that the first thing that told you that you might have some problem with your hearing? A. Yeah. . . .

"Q. When is the first time that you noticed any kind of problem, not necessarily as bad as it is today, but the first time you noticed it? A. '83. Q. What did you notice back then? A. My ears rang a little . . . Occasionally. . . . I'd notice it two or three times a month maybe. Q. Did you ever notice it when you were away from work at that time? A. Yeah. . . . I thought it's probably from noise. Q. From noise at work? A. Yeah, but it never was persistent or constant. Q. Do you experience a ringing in your ears occasionally or all the time now? A. All the time now. It never stops. . . . Q. When did you first notice ringing in your ears on more than just an occasional basis, more than just two or three times a week? A. '87."

On April 20, 1989, plaintiff answered a hearing loss questionnaire by stating that he experienced (1) a ringing in the ears, (2) a hard time understanding words in a noisy environment, (3) the muffling of familiar sounds and (4) a need to watch a person speak to understand the words. Regarding the approximate dates of these experiences, plaintiff responded that they were "progressive over [the] last 10 years."

Plaintiff was seen by Dr. Ethan F. Staats, an otolaryngologist, on April 4, 1991. Dr. Staats deposed that plaintiff told him he noticed a decline in his hearing in the "early 1980's and it had gradually become worse." Asked if he was given a specific year, Dr. Staats responded: "No, he — the onset of it was vague and gradual. According to him, it began — according to my notes, somewhere around '80 to '83."

In an affidavit, Dr. Staats deposed: "Noise-induced hearing loss is usually a cumulative permanent loss of hearing that develops gradually over years of exposure to hazardous noise. This latent occupational disease involves a long, slow progressive process that slowly wears away an individual's hearing. Because of the cumulative nature of this injury, [it] is not usually discernible at the time of exposure and it is virtually impossible to correlate the progression of the disease with specific exposures on specific dates. . . . [B]ecause of the progressive nature of this occupational disease, victims who have not been made aware of the correlation between noise exposure and hearing loss do not ordinarily attribute the loss of hearing to their exposure to noise. . . . A large part of the reason industrial workers, including [plaintiff], are not aware of their loss is because of a common condition known as Temporary Threshold Shift (TTS). In the course of my practice and research experience as an Otolaryngologist and as a hearing conservation professional, I have learned that the phenomenon of TTS is a difficult impediment to the education and awareness of workers to the danger of noise. Because of the fact that symptoms of TTS tend to 'disappear' by the next work day, noise-exposed workers tend to believe that they are not experiencing any form of underlying or permanent hearing loss. Those of us who have been trained in the effects of noise and are aware of the fact that TTS, while not permanent injury, is indicative of the underlying process of damage which, if not controlled, will eventually result in noise-induced, permanent threshold shift. Workers who have not been trained, or who do not understand this phenomenon, commonly believe just the opposite precisely because of the fact that TTS is, by definition, temporary."

Section 56 of Title 45, United States Code, provides that "[n]o action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued." Thus, in

deciding whether plaintiff's cause of action is time barred, we must determine "the day the cause of action accrued."

It is relatively easy to determine the day a cause of action accrued in the context of an immediate, recognizable injury. When it comes to an occupational illness which is not immediately apparent, on the other hand, it is hard to pinpoint the date of accrual. The United States Supreme Court recognized this problem in *Urie v. Thompson*, 337 U. S. 163 (69 SC 1018, 93 LE 1282), a FELA case in which the employee alleged he contracted silicosis over the course of his long employment: " '[N]o specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently, the afflicted employee can be held to be "injured" only when the accumulated effects of the deleterious substances manifest themselves.' [Cit.]" Id. at 170.

*Urie v. Thompson*, 337 U. S. 163, supra, intimated that a plaintiff cannot avoid the statute of limitation by choosing to ignore the early signs and symptoms of his disease. Id. at 170. The Supreme Court made this clear in *United States v. Kubrick*, 444 U. S. 111 (100 SC 352, 62 LE2d 259), a Federal Tort Claims Act case, in which it was said that a plaintiff has a duty to investigate an injury and the cause of the injury when he experiences symptoms of an injury. Id. at 123. Thus, it has been held that "a claim accrues under FELA when the plaintiff possesses sufficient critical facts from which the injury and its cause, including its work-relatedness, should be plainly known. *Dubose v. Kansas City Southern Ry. Co.*, 729 F.2d 1026 (5th Cir.), cert. den. 469 U. S. 854, 105 S.Ct. 179, 83 L.Ed.2d 113 (1984); *Jones v. Maine Cent. R. Co.*, 690 F.Supp. 73 (D.Me. 1988)." *McCoy v. Union Pacific R. Co.*, 796 P2d 646 (Or. App. 1990).

At what point did the effects of the noise in plaintiff's workplace manifest themselves? Plaintiff contends the effects did not manifest themselves until 1987. In this regard, plaintiff argues that any prior manifestations of hearing loss were only temporary and that he did not notice any lasting effects until he experienced a "constant, tinnitus, or ringing in his ears. . . ." We cannot accept plaintiff's contention.

It is clear to us that plaintiff's hearing loss manifested itself at least by 1983 and that plaintiff knew at that time that his condition was caused by on-the-job noise: In his deposition, plaintiff admitted that as early as 1983 he experienced a ringing in his ears two or three times a month. In his 1989 responses to a hearing loss questionnaire, plaintiff acknowledged that his hearing problems became progressively worse over a ten-year period. Moreover, plaintiff told Dr. Staats that he experienced a hearing loss in the early 1980s. Thus, plaintiff knew or should have known of a work-related injury long before the

three-year limitation period. "That [plaintiff's] injury had not reached its maximum severity in [the early 1980s] but continued to progress does not affect this result." *Fries v. Chicago & Co. Transp. Co.*, 909 F2d 1092, 1096 (7th Cir. 1990).

Relying upon the affidavit of Dr. Staats, plaintiff argues, in effect, that as an industrial worker he could not be expected to know that his initial hearing problems were serious enough to seek medical attention. We disagree. "The accrual of a claim under FELA, however, does not require that the plaintiff be disabled . . . [W]hether or not plaintiff's condition was bad enough to cause him to go to the doctor is irrelevant, if, as the evidence here shows, he knew of his condition and its cause." *McCoy v. Union Pacific R. Co.*, supra at 649.

*Judgment affirmed. Sognier, C. J., and Cooper, J., concur.*

DECIDED JUNE 26, 1992.

*Jones & Granger, Charles M. Hardman, J. Ashton Moss*, for appellant.

*Alston & Bird, Jack H. Senterfitt, Linda G. Carpenter*, for appellee.