A06A0769. PHELPS v. CSX TRANSPORTATION, INC.
(634 SE2d 112)

BARNES, Judge.

Claude Phelps appeals the trial court's grant of summary judgment to CSX Transportation, Inc. in this action brought under the Federal Employers' Liability Act (FELA). For the reasons that follow, we affirm in part and reverse in part.

Phelps sued CSX on March 17, 2003, contending that he sustained numerous injuries during his employment with the railroad for which he is entitled to receive compensation. Those injuries fall into two major categories: his upper extremities and his lower extremities.[1] Phelps claims that he experienced repetitive stress injuries to his hands, wrists, and arms due to the company's negligent failure to provide adequate protective equipment, negligent failure to provide a safe work environment, and negligent assignment of him to jobs that excessively strained his upper extremities. He contends that he suffered injuries to his feet, ankles, and knees due to the company's negligent assignment to jobs that exposed him to excessive stress and strain from walking on uneven surfaces and climbing, negligent assignment to jobs requiring use of a scissor lift on uneven surfaces, and negligent failure to provide a safe work environment. Phelps amended his complaint to contend that, between March 31, 2002 and June 6, 2002, CSX caused or aggravated conditions in his feet, ankles, and knees.

---

[1] While Phelps initially argued that CSX's negligent failure to provide proper equipment caused low back pain, in his supplemental brief he states that "there has been no claim for back pain since Mr. Phelps told the railroad that his back pain resolved within a short period of time." Therefore, the trial court did not err in granting summary judgment on his low back claim.

After discovery ended, CSX moved for summary judgment, arguing that Phelps failed to prove medical causation in his claims for injuries, and that to the extent he could establish medical causation as to his right ankle and left foot, the three-year statute of limitation had run. Phelps responded that, while some of his problems began more than three years before suit was filed, all of them were aggravated by CSX's negligence between March 31, 2002, when Phelps returned to work after surgery, and June 6, 2002, when he stopped working. He further responded that the deposition testimony of three of his doctors established causation, and argued that, in FELA cases, the jury determines causation, not the doctor. The trial court granted summary judgment to CSX, finding that Phelps "failed to set forth . . . specific evidence of any employer negligence causally related to the claimed injuries."

In reviewing a trial court's decision on a motion for summary judgment, we view the evidence in the light most favorable toward the party opposing the motion and give him the benefit of all reasonable inferences that can be drawn from the record, including the pleadings, motions, briefs, depositions, and the trial court's order. *Currin v. Seaboard System R.*, 187 Ga. App. 751 (371 SE2d 142) (1988).

So viewed, the evidence shows that Phelps was a railroad employee for 20 years, working in different jobs and locations throughout his career. In December 2001, Phelps had surgery on his right ankle, and after undergoing a course of physical therapy, his orthopedic surgeon noted on March 23, 2002, that Phelps had minimum pain and swelling in his ankle. The surgeon released him to return to work on April 1, 2002, with the understanding that he would be operating a backhoe, and said that if he returned to work on the uneven surfaces of the track he would have problems with his ankle. Phelps talked with his supervisor, who assured him he could return to run the backhoe, which would keep him off of "the rock," or the track.

On March 31, 2002, Easter Sunday, Phelps' supervisor called him to come in and help fix a broken rail. Phelps read to the supervisor over the phone his doctor's letter regarding his limitations but the supervisor insisted he come in. Phelps went to work and helped fix the rail, which also involved putting a high rail truck filled with heavy tools back onto the tracks. When the job was done, Phelps told his supervisor he could not perform that kind of work with his damaged leg, and was again assured that he would not have to work the rock.

When Phelps began work the next day, he discovered that the railroad had cut out the former two-man welding gang at his location, leaving only three men there instead of five. Consequently, Phelps

had to help fix all the daily broken rails and perform constant resurfacing work, essentially working as a trackman or in a section gang, fixing whatever needed to be fixed. His job entailed climbing into and out of ditches and on and off backhoes; pulling up and setting spikes; jacking up, removing, and setting cross-ties; loading and unloading material from trucks; and cleaning up ballast rock with rock forks. The location had no surface gang, and thus much of the track had to be surfaced by hand.

Phelps' ankle began swelling and hurting, and he went to his supervisor twice in the next three months, showed him his swollen ankle and asked him to please allow him to transfer to another job where he could work as a machine operator, but the supervisor refused to do so. He would tell the supervisor he could not work on the rocks, that "it was just killing me, my ankle. I couldn't stand it, and the next day he'd put me right back doing it again." The supervisor called him names, "as far as candy-ass and different stuff like that," and told a fellow employee that Phelps was "being wimpy" about his leg. Phelps said, "I begged him to get me off of [the rocks] and he wouldn't do it. And I just went until I couldn't go no more." As it turned out, instead of driving the backhoe, he was "just a section man, . . . [a]nd that's one thing that bothers me so much about the whole thing is the whole time period through there, when I started having so much trouble and so much pain, I would go to [the supervisor] and tell him and he wouldn't do anything about it but talk ugly to me."

Phelps' right knee began bothering him after his gait changed due to his ankle injury, which made him limp. On June 6, 2002, while walking to his dump truck on his way to load crossties, he tripped on debris in the yard and fell to his hands and knees. His right knee, which took most of his weight in the fall, was hurting and his ankle was "killing" him. He went to his supervisor, who suggested maybe Phelps could get a brace for his leg. Then Phelps saw his primary care physician, who directed him not to work until he could see his orthopedic surgeon, due to severe degenerative changes in his ankle and contusions and fluid on his knee. The physician noted that Phelps was "tearful, depressed, and anxious," which was unusual for him. Phelps said he became emotional due to a combination of ankle, knee, back, and mental pain. At a follow-up visit on June 11, 2002, the physician noted that Phelps' ankle still hurt, his knee was catching, and his low back was hurting also.

On July 7, 2002, the orthopedic surgeon noted that Phelps had been doing fine on flat surfaces but was in pain after walking on uneven surfaces. He was "not happy" Phelps was back on the rock. The surgeon noted that Phelps' knee was painful where he fell on it, and his ankle was swollen and painful. The surgeon permanently restricted him from working on uneven surfaces and diagnosed a

course of physical therapy. While the doctor admitted he could not prove that the changes to Phelps' right ankle were caused by working on uneven rocks, he testified that walking on uneven surfaces would aggravate arthritis, so the work restriction was to protect the joint from further deterioration. Phelps wears a brace daily and takes anti-inflammatory and pain medication; the only other treatment available for his ankle joint would be to fuse it or replace it.

Phelps first experienced trouble with his left ankle in May 2000, when it began swelling. A podiatrist injected him with cortisone and diagnosed heel spurs. An orthopedic surgeon treated him with anti-inflammatory medication and stretching exercises and found no sign of left ankle injury.

Phelps experienced problems with his hands since May 2000. He used heavy vibrating tools constantly throughout his career. For example, he used a tamper three to four times a month for thirty to forty-five minutes at a time, impact wrenches weekly, a grinder two to three times per week for thirty to forty-five minutes at a time, a number ten spike maul hammer daily for an hour or two at a time, and a railsaw and rock forks daily for an hour or two at a time. He began waking at night because his hands were tingling, aching, and numb. In 2001 his supervisor directed him to throw 100-pound kegs of spikes off a pickup truck along a rail line in Columbia County, which hurt his hands and wrists. Another orthopedic surgeon who specialized in treating hands and wrists conducted nerve studies on Phelps in June 2000 and diagnosed chronic bilateral carpal tunnel syndrome. The surgeon testified that, while scientists debate what causes the problem, repetitive heavy use can cause carpal tunnel syndrome, probably because "the nerve itself probably takes some increased pressure from the direct trauma and use of the hands, as well as there are soft tissues, their synovium, which is the covering of the tendons which traverse the carpal tunnel with the nerve, become thicker, and therefore compress the nerve." He thought it was possible that Phelps' work activities caused it. Phelps' wrists remained symptomatic until he had surgery on them, one in June 2003 and the other in August 2003. As a patient Phelps was very cooperative and motivated, and he had excellent results in both hands.

Under FELA, railroad companies are liable for injuries to their employees that result in whole or in part from company negligence. *Norfolk Southern R. Co. v. Schumpert*, 270 Ga. App. 782 (608 SE2d 236) (2004). Federal law interpreting FELA governs this issue. *Bagley v. CSX Transp.*, 219 Ga. App. 544, 545-546 (465 SE2d 706) (1995). The common-law definition of causation is not applicable here, and in fact, FELA is "an avowed departure from the rules of the common law." *Sinkler v. Missouri Pacific R. Co.*, 356 U. S. 326, 329 (78 SC 758, 2 LE2d 799) (1958). The statute passed in "response to the

special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety. [Cit.]" Id.

"Under FELA, the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." (Citation, punctuation and footnote omitted.) *Norfolk Southern R. Co. v. Schumpert*, supra, 270 Ga. App. at 784 (1). The "[s]light negligence, necessary to support an FELA action, is defined as a failure to exercise great care, and that burden of proof, obviously, is much less than the burden required to sustain recovery in ordinary negligence actions." (Citations and punctuation omitted.) *Kelson v. Central of Ga. R. Co.*, 234 Ga. App. 200, 203 (1) (a) (505 SE2d 803) (1998). "Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities." (Citations and punctuation omitted.) *Hepner v. Southern R. Co.*, 182 Ga. App. 346, 348 (356 SE2d 30) (1987). Nevertheless, some evidence of causation is required, as FELA is not a no-fault workers' compensation statute. *Consolidated Rail Corp. v. Gottshall*, 512 U. S. 532, 543 (114 SC 2396, 129 LE2d 427) (1994).

The employer is stripped of his common-law defenses under FELA, and the inquiry is almost always whether the employer's negligence played any part in the injury that is the subject of the suit. The employee meets that burden if he presents proof "even though entirely circumstantial, from which the jury may[,] with reason," infer that the employer's negligence played any part in the injury. *Cook v. Seaboard System R.*, 184 Ga. App. 838, 840 (2) (363 SE2d 56) (1987). "The Congress when adopting the law was particularly concerned that the issues of whether there was employer fault and whether that fault played any part in the injury or death of the employee should be decided by the jury whenever fair-minded men could reach these conclusions on the evidence." (Citation and punctuation omitted.) Id. (reversing grant of summary judgment to employer although only testimony submitted from employee was his deposition testimony). The employee must bring suit within three years of the injury or aggravation. 45 USC § 56; *Robb v. CSX Transp.*, 204 Ga. App. 690 (420 SE2d 370) (1992).

The employer has a duty to provide the employee a reasonably safe workplace which includes safe conditions, tools, facilities, and supervision. That duty of providing a safe workplace also extends to providing a workplace which does not aggravate a pre-existing injury. *Currin v. Seaboard System R.*, supra, 187 Ga. App. at 752. "The railroad has a continuing and nondelegable duty to provide its

employees with safe working conditions. [Cits.] The railroad must take all necessary and reasonable precautions to prevent injury to its employee when put on notice of his condition. [Cit.]" *Hepner v. Southern R. Co.*, supra, 182 Ga. App. at 347.

Recognizing this duty not to aggravate a pre-existing condition, the Oregon Court of Appeals affirmed a judgment for a railroad worker for aggravation of his hearing loss, analogizing the situation to that of a plaintiff with a pre-existing back injury who was entitled to damages if the injury was aggravated by a car wreck caused by the negligence of another driver. *McCoy v. Union Pacific R. Co.*, 102 Ore. App. 620 (796 P2d 646, 650) (1990). To establish a claim for aggravation of a pre-existing injury, the worker must show (1) that the employer was negligent during the applicable time period; (2) that that negligence aggravated the pre-existing injury; and (3) the degree to which it aggravated the injury. *Everett v. Norfolk Southern R. Co.*, 218 Ga. App. 862, 864 (2) (464 SE2d 385) (1995).

Phelps testified that after he returned to work with restrictions, which his supervisor ignored, he informed his supervisor that the work he was doing was aggravating his leg, but "his complaint fell upon deaf ears. There was thus evidence that the employer was put on notice of some injury to [Phelps' leg], yet neither inquired as to the extent of the injury nor demonstrated any concern over it, and consequently allowed [Phelps] to [continue working]." *Brooks v. Southern R. Co.*, 178 Ga. App. 361, 363 (343 SE2d 143) (1986) (affirming grant of summary judgment as to initial injury caused by lifting board but reversing grant as to claim of aggravation of injury).

CSX argues that Phelps failed to present sufficient medical evidence of causation or degree of causation, citing *Lutz v. CSX Transp.*, 208 Ga. App. 894 (432 SE2d 569) (1993) and *Bowles v. CSX Transp.*, 206 Ga. App. 6, 7 (2) (424 SE2d 313) (1992). Both cases involved claims of hearing loss and, unlike this case, the only evidence was the employee's testimony that he had been exposed to noise during his employment. In affirming the grant of summary judgment to CSX, we noted among other things that "[e]xpert testimony is required where the disposition of a 'medical question' controls the resolution of a case. [Cits.]" *Bowles v. CSX Transp.*, supra, 206 Ga. App. at 7 (2). " 'Medical questions' may be defined as those concerning highly specialized expert knowledge with respect to which a layman can have no knowledge at all, and the court and jury must be dependent on expert evidence." (Citation and punctuation omitted.) *Eberhart v. Morris Brown College*, 181 Ga. App. 516, 518 (1) (352 SE2d 832) (1987). We also found that neither employee presented any evidence that CSX's negligence caused the hearing loss, and that the statute of limitation ran on both cases.

In this case, while Phelps presented his testimony that he used vibrating tools and his doctor's testimony that these tools may have caused or contributed to his carpal tunnel syndrome, he did not present any evidence that CSX's negligence caused or contributed to his syndrome. In the absence of evidence showing CSX was negligent in requiring him to work with these tools, the trial court did not err in granting summary judgment to CSX on Phelps' claims of injury to his arms, wrists, and hands.

Similarly, Phelps has not presented any evidence that CSX's negligence caused or contributed to injuries to his feet, left ankle, and left knee. Thus the trial court also did not err in granting summary judgment to the railway regarding these injury claims.

Phelps did, however, present sufficient evidence that CSX negligently assigned him to perform work that aggravated the injury to his right ankle, despite his repeated requests for a transfer to a job that met his medical restrictions. Further, evidence of Phelps' supervisor's verbally abusive behavior may also establish aggravation of his ankle injury.

> He had been placed on light duty by his doctor, but was vilified by his supervisor for following the doctor's instructions and ordered to [work on the track instead of ride on a backhoe]. Such evidence shows that he did not injure his [ankle] by voluntarily disobeying his doctor's orders, but rather that he was forced to do so by his supervisor.

*Central of Ga. R. Co. v. Cole*, 191 Ga. App. 53, 55 (2) (381 SE2d 60) (1989). Whether Phelps' work assignment was negligent is a jury question. *Currin v. Seaboard System R.*, supra, 187 Ga. App. at 753. While CSX argues that Phelps failed to provide evidence regarding the degree of his aggravation, the evidence as outlined above is sufficient for the jury to determine how much his ankle was aggravated by the railroad's negligence. He also presented some evidence that his right knee problem resulted from the aggravation of his ankle injury and from debris in the yard over which he tripped. Thus we conclude that the trial court erred in granting summary judgment to CSX on Phelps' claim of injury or aggravation of injury to his right ankle and right knee.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Bernes, J., concur.*

DECIDED JULY 7, 2006.

*Burge & Burge, Frank T. Burge*, for appellant.

*Casey, Gilson & Leibel, James E. Gilson, Glenn C. Tornillo*, for appellee.