S09G1177. COWART et al. v. WIDENER et al.

(697 SE2d 779)

NAHMIAS, Justice.

The plaintiffs in this wrongful death case are Roby E. Cowart, Sr.'s estate and his two adult children. The defendants are Cowart's brother-in-law Nathan Lee Widener, the trucking company for which Widener drove, and the company's insurance carrier. The trial court granted summary judgment to the defendants after concluding that the plaintiffs could not establish that Widener proximately caused Cowart's death without producing expert evidence, which they had failed to do. The Court of Appeals affirmed. See *Cowart v. Widener*, 296 Ga. App. 712 (675 SE2d 591) (2009). We granted certiorari, posing two questions: (1) whether expert evidence is required to establish causation in a simple negligence case where a medical question is involved; and (2) if so, what constitutes a "medical question" so as to require such expert testimony.

As explained in Division 2 below, expert evidence typically is not required to prove causation in a simple negligence case. See, e.g., *Self v. Exec. Comm. of the Ga. Baptist Convention of Ga.*, 245 Ga. 548, 549 (266 SE2d 168) (1980). However, expert evidence is required where a "medical question" involving truly *specialized* medical knowledge (rather than the sort of medical knowledge that is within common understanding and experience) is needed to establish a causal link between the defendant's conduct and the plaintiff's injury. See, e.g., *Gilbert v. R. J. Taylor Mem. Hosp.*, 265 Ga. 580, 581 & n. 4 (458 SE2d 341) (1995) (whether the plaintiff actually had cancer that required

treatment); *Allstate Ins. Co. v. Sutton*, 290 Ga. App. 154, 160 (658 SE2d 909) (2008) (whether exposure to mold caused the plaintiffs' respiratory ailments).

This is an unusual wrongful death case because the plaintiffs do not allege that Widener caused the internal bleeding that killed Cowart, but rather that Widener failed to render aid to Cowart in a way that would have prevented his death. As we discuss in Division 3 below, the plaintiffs failed to produce evidence — ordinary and expert — showing causation under these unusual circumstances, and therefore the trial court properly granted summary judgment to the defendants.

1. (a) The standards for reviewing summary judgments are settled. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). Thus, to prevail on a motion for summary judgment, " 'the moving party must demonstrate that there is no genuine issue of material fact,' " *Montgomery v. Barrow*, 286 Ga. 896, 898 (692 SE2d 351) (2010) (citation omitted), so that the party "is entitled to judgment as a matter of law," *Kaplan v. City of Sandy Springs*, 286 Ga. 559, 560 (690 SE2d 395) (2010).

"A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims." *Oglethorpe Dev. Group v. Coleman*, 271 Ga. 173, 173 (516 SE2d 531) (1999). Thus, "the rule with regard to summary judgment" is that

> a defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case.

*Cox Enterprises, Inc. v. Nix*, 274 Ga. 801, 803 (560 SE2d 650) (2002).

Where a defendant moving for summary judgment "discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." *Lau's Corp. v. Haskins*, 261 Ga. 491, 491 (405 SE2d 474) (1991). See OCGA § 9-11-56 (e) ("When a motion for summary judgment is made and supported as provided in this Code section, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Code section, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary

judgment, if appropriate, shall be entered against him.'').

Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. See *Chester v. Smith*, 285 Ga. 401, 401 (677 SE2d 128) (2009); *Merlino v. City of Atlanta*, 283 Ga. 186, 186 (657 SE2d 859) (2008). In our de novo review of the grant of a motion for summary judgment, we must "view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." *Kaplan*, 286 Ga. at 560.

(b) Viewed in the light most favorable to the plaintiffs, and drawing all reasonable inferences from the record evidence in their favor, the record shows as follows, with the facts that are based entirely on expert testimony so noted. On November 30, 2003, Nathan Lee Widener left Augusta, Georgia bound for Ohio in his tractor-trailer to deliver freight for United Transportation, Inc. (UTI). Widener's contract with UTI allowed him to choose his own routes but barred him from having passengers ride along unless authorized in writing by UTI. UTI did not authorize Widener to carry passengers, but his brother-in-law, 43-year-old Roby E. Cowart, Sr., rode with him on this trip.

Cowart had fallen on hard times. He was unemployed, had no money, and had been living out of his car. Widener was married to Cowart's sister, and the couple took him in and began feeding and clothing him.

Cowart suffered from a number of health problems, including severe erosive esophagitis caused by gastric acid coming into contact with the esophagus. As a result, Cowart experienced oozing of blood in his throat and a narrowing of the esophageal wall, and it was not unusual for him to cough up small amounts of blood. Expert testimony later explained that blood is an irritant, and that esophageal bleeding can cause vomiting, which in turn can lead to a potentially fatal rupture of the esophagus.

Widener planned to leave for Ohio in the afternoon. That morning, Cowart asked Widener if he could ride along. Widener's wife asked Cowart how he was feeling, and Cowart responded that he felt good, that he wanted to get out of Augusta, and that he wanted to go with Widener to Ohio. At one point, Widener saw Cowart cover his mouth with a Kleenex as a purplish substance trickled out the side of his mouth. Cowart simply wiped it off, flushed the tissue down the toilet, and went back to bed to lie down. Widener had seen Cowart with some blood on the corner of his mouth on several mornings during the past couple months, as had his wife. When they would ask Cowart if he was all right, he would tell them yes, and that he "does that all the time." Widener's wife had tried on several

occasions to get Cowart to see a doctor or go to the emergency room, but he always refused.

Widener and Cowart left for Ohio that afternoon as planned. Around 2:30 p.m. the following day, December 1, 2003, as the two men traveled north on Interstate 75 near the Kentucky-Tennessee border, Cowart told Widener that his "throat was closing in on him" and that he was spitting up blood. Widener told Cowart that he looked ill, but Cowart said he was feeling fine, that he wanted to lie down in the sleeper compartment, and not to bother him. Cowart then went into the sleeper compartment, closed the curtain separating it from the front of the cab, and lay down in the bottom bunk. There is no evidence that Cowart ever requested medical assistance.

About three hours later, as the truck approached Lexington, Kentucky, Widener began to smell an extremely foul odor, which expert testimony later indicated was characteristic of diarrhea after substantial internal bleeding. Widener pulled into a truck stop and called his wife, a nurse, to ask her what he should do. She asked if her brother was still alive, and Widener told her that he did not know. She told him to check Cowart's pulse and see whether he was breathing. Widener did as instructed, finding that Cowart was not breathing and had no pulse; he was dead. Nevertheless, Widener returned to the driver's seat, pulled out of the truck stop, and continued on to Ohio. Widener later explained that he was concerned about how his brother-in-law's dead body would get back to Georgia if he did not bring it with him in the truck when he returned home.

Around midnight or early morning on December 2, 2003, Widener pulled into a rest stop about 30 miles north of Columbus, Ohio. Widener accidentally backed his truck into another truck at the rest stop, causing minor damage. An Ohio Highway Patrol officer responded to the incident. According to the officer, Widener was acting very nervous and repeatedly stated that he was alone and did not have any passengers. The officer noticed that Widener kept glancing back at the curtain to the sleeper compartment, so she asked him to open it, telling him jokingly that she needed to "make sure he didn't have any dead bodies" back there. Widener responded, "Well, my brother-in-law is back there, but I don't think he is dead."

The trooper had Widener check Cowart for signs of life while she called for backup. The body was already cold, and Widener later admitted that he had known for at least the past five or six hours that Cowart was dead. Cowart's body was taken to a morgue at a local hospital.

After speaking with the police and Widener and briefly examining the body, the coroner concluded that Cowart's death likely resulted from natural causes, and that no autopsy would be performed unless the family requested one. The coroner spoke with

Cowart's sister, who said that an autopsy would not be necessary. The coroner listed the cause of death as "exsanguination" after two hours of "gastrointestinal hemorrhage" resulting from years of peptic ulcer disease. The coroner later explained that the two-hour figure was an approximation based on when Widener said he last saw Cowart alive and the coroner's estimate of how long Cowart had been dead when he examined the body. The coroner also testified that a person hemorrhaging internally can be asleep and not realize what is happening. The only blood found in the truck's cab or sleeper compartment was a small amount of granulated blood at the corner of Cowart's mouth and on some tissues he had used.

The plaintiffs filed a wrongful death suit against Widener, UTI, and UTI's insurance carrier, American International South Insurance Company (AIS). The complaint alleged that Widener negligently or intentionally deprived Cowart of necessary medical attention, thereby causing his death. UTI was named as a defendant based on respondeat superior and other theories of liability, and AIS was brought in under Georgia's direct action statute, OCGA § 46-7-12.1. Following extended discovery, the defendants filed motions for summary judgment, which the trial court granted. The Court of Appeals affirmed, and we granted the plaintiffs' petition for certiorari.

2. We believe that both questions this Court posed in granting certiorari are easily answered based on Georgia's case law and basic principles regarding when expert evidence is necessary to prove a fact.

(a) In *Self*, this Court stated broadly that "[t]here is no requirement that expert testimony must be produced by a plaintiff to a negligence action in order to prevail at trial. The weight given to expert testimony in such cases is for the trier of fact, who is not required to give it controlling influence." 245 Ga. at 549. *Self*, however, did not involve a situation where the plaintiff needed to go beyond common knowledge and experience to meet her initial burden of showing causation. In that wrongful death case, the plaintiff's husband died in the hospital from bleeding in his head. See id. at 548. The plaintiff alleged that his death was caused when he struck his head after slipping and falling due to the hospital's negligence. See id. The defendant hospital responded with expert evidence claiming that the patient's death was instead due to acute leukemia, but we held that this only created a material issue of fact for the jury to decide. See id.

Later cases do not dispute that *Self* stated the general rule for simple negligence cases — that plaintiffs need not produce expert evidence on causation — but subsequent cases from this Court and the Court of Appeals have also recognized that there are exceptions.

Thus, in *Gilbert*, we expressly noted that the plaintiff's cause of action was for simple negligence and not medical malpractice, but we nonetheless held that "medical questions are raised, requiring expert evidence." 265 Ga. at 581, n. 4 (citing *Cherokee County Hosp. Auth. v. Beaver*, 179 Ga. App. 200, 205 (345 SE2d 904) (1986)). In short, even in simple negligence cases, plaintiffs must come forward with expert evidence to survive a defense motion for summary judgment, where "medical questions" relating to causation are involved.

(b) The second certiorari question — what constitutes such a "medical question" — is also answered by the case law and standard principles regarding ordinary and expert evidence. In this context, the term "medical question" has been used to describe situations where the existence of a causal link between the defendant's conduct and the plaintiff's injury cannot be determined from common knowledge and experience and instead requires the assistance of experts with specialized medical knowledge. See, e.g., *Phelps v. CSX Transp.*, 280 Ga. App. 330, 335 (634 SE2d 112) (2006); *Eberhart v. Morris Brown College*, 181 Ga. App. 516, 518 (352 SE2d 832) (1987); *Beaver*, 179 Ga. App. at 204. See also OCGA § 24-9-67.1 (b) ("If scientific, technical, or other specialized knowledge will assist the trier of fact in any cause of action to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise [where three specified criteria are met].").

The simple term "medical question" may not be the best description of this concept, because its everyday meaning does not convey the distinction between cases where plaintiffs must come forward with expert evidence on causation and cases where they do not. In common parlance, a "medical" question is any question "of or connected with the practice or study of medicine." Webster's Collegiate New World Dictionary 496 (2d ed. 1987). In this sense, almost *all* deaths could be said to involve "medical questions" relating to causation. How many people could describe with precision how a gunshot wound to the head actually causes the death of a human being? But it does not require expert testimony for a lay jury to determine that a gunshot wound to the head of an otherwise healthy person who died shortly thereafter was the proximate cause of her death.

This is particularly true given the broad responsibility that Georgia law places on tortfeasors for the consequences of a breach of a legal duty. In the tort context, proximate causation includes all of the natural and probable consequences of the tortfeasor's negligence, unless there is a sufficient and independent intervening

cause. See *Blakely v. Johnson*, 220 Ga. 572, 574-576 (140 SE2d 857) (1965); *Perry v. Central R.R.*, 66 Ga. 746, 751 (1881). Moreover, tortfeasors take their victims as they find them. See *AT Systems Southeast v. Carnes*, 272 Ga. App. 671, 674 (613 SE2d 150) (2005); 2 Jacob A. Stein, Personal Injury Damages § 11:1 (3rd ed.). If the person a tortfeasor negligently cuts happens to be a hemophiliac who bleeds to death where most others would have survived, the tortfeasor remains responsible for that wrongful death. See *Coleman v. Atlanta Obstetrics & Gynecology Group*, 194 Ga. App. 508, 510-511 (390 SE2d 856) (1990), aff'd, 260 Ga. 569 (398 SE2d 16) (1990); Restatement (Second) of Torts § 461, cmt. a (1965).

In other words, most "medical questions" relating to causation are perfectly capable of resolution by ordinary people using their common knowledge and experience, without the need for expert testimony. Thus, in a wrongful death action based on the theory that the defendant proximately caused the decedent's death by stabbing her in the gut, the plaintiff is not required, in response to a motion for summary judgment, to come forward with expert testimony explaining in medical terms precisely how the wound led to her death. Where the causal link between the defendant's conduct and the decedent's injury can be determined by a lay jury without expert guidance, no expert evidence need be produced to defeat a defense motion for summary judgment. See, e.g., *Jester v. State*, 250 Ga. 119, 119-120 (296 SE2d 555) (1982) ("[T]hat a stab wound penetrating entirely through the heart causes death, is not a matter . . . which should even require expert testimony."); *Sutton*, 290 Ga. App. at 160 ("[W]hether a blow to the head could cause death [is] a question that we have held to be within a lay person's knowledge"); *Jordan v. Smoot*, 191 Ga. App. 74, 74 (380 SE2d 714) (1989) (holding that whether an automobile collision caused a backache later the same day is not the type of medical question that requires expert testimony).

However, sometimes the link between a defendant's actions and the plaintiff's injury is beyond common knowledge and experience. An example would be a toxic tort case like *Sutton*. There, the plaintiff alleged that she and her daughter suffered ongoing and exacerbated respiratory ailments as a result of exposure to mold in their home caused by faulty repairs and remediation work after a plumbing leak. See 290 Ga. App. at 159-160. The trial court denied the defendants' motion for summary judgment on causation grounds, but the Court of Appeals reversed, noting that "[t]he diagnosis and potential continuance of a disease or other medical condition are 'medical questions to be established by physicians as expert witnesses and not by lay persons.' " Id. at 160 (citation omitted). The court held that the plaintiff's failure to point to any expert medical testimony

establishing a causal link between the respiratory conditions and the mold meant that the defendants were entitled to summary judgment. See id. at 159-160.

*Gilbert* involved a variation on this concept. The defendant hospital performed a diagnostic breast biopsy on plaintiff Sharon Gilbert, and a hospital employee lost the specimen on the way to the pathology laboratory. See 265 Ga. at 580. Prevented by the loss of the specimen from determining whether the breast nodule was malignant, Gilbert's doctors advised her to start cancer treatment. Gilbert followed her doctors' advice, undergoing severe treatment that included a lumpectomy, lymph node dissection, and radiation treatment. See id. No evidence of cancer was detected, and Gilbert sued the hospital for negligence for losing the biopsy sample. See id. at 581.

The hospital filed a motion for summary judgment supported by expert affidavits from two doctors opining that Gilbert did, in fact, have cancer, and thus she needed the treatment she received. See id. That diagnosis would disprove the causation element of her negligence claim, but it could not be determined by a jury without expert evidence. Thus, at that point, it was incumbent on Gilbert to come forward with evidence creating a material issue of fact on the element of causation. She did so with an expert affidavit opining that it was impossible for the hospital's experts to say to a reasonable degree of medical certainty that she had cancer based on the limited information available to them. See id. We upheld the trial court's determination that Gilbert's expert evidence created a genuine issue of fact on the material question of causation, precluding summary judgment in favor of the hospital. See id.

Thus, in deciding whether the plaintiff is required to come forward with expert testimony to withstand a defense motion for summary judgment, the critical question is not whether the causation element involves a "medical question" in the generic sense of the term. Rather, it is whether, in order to decide that the defendant's conduct proximately caused the plaintiff's injury, a lay jury would have to know the answers to one or more "medical questions" that, as the case law has defined that term, can be answered accurately only by witnesses with specialized expert knowledge. To make the term more clearly reflect its use in deciding cases, we will now refer to "specialized medical questions." For the reasons discussed above, such expert evidence is not required in the mine run of simple negligence cases, but it is required in some negligence cases.[1]

---

[1] It should therefore be clear that we are not "reject[ing]" the phrase "medical question,"

3. We did not direct the parties to apply the general answers to the two questions we posed on certiorari to the specific facts of this case, but that is the natural next step, and the parties did so in their briefs and at oral argument. We will address that issue both to resolve this case and to demonstrate the analysis discussed in Division 2 above. We first explain that, aside from any specialized medical questions, the plaintiffs have not met their burden to show causation based on the record evidence. In addition, and even assuming that Widener's testimony were disbelieved (as the dissent would have it), the plaintiffs have failed to offer the expert evidence that would be needed on the specialized medical question of whether Widener's failure to render aid based on Cowart's internal bleeding could have made a difference in preventing Cowart's death.

(a) The plaintiffs focus on showing that Cowart's death was "caused" by internal bleeding. They insist that the evidence, viewed most favorably to them, proves that Cowart bled to death, because that was the conclusion of the coroner, the only medical doctor to examine the body. They also point to the testimony of Cowart's treating physician that Cowart had severe erosive esophagitis from gastric acid exposure, which caused blood to ooze from his esophagus, as well as the physician's commonsense observation that if internal bleeding is left untreated over a period of hours, "death could be the likely result." They note Widener's admission that Cowart spit up blood in the hours before he died and claim that there is no evidence that Cowart died from anything but internal bleeding. The plaintiffs maintain that summary judgment on the issue of causation was inappropriate, because a jury confronted with undisputed evidence of internal bleeding and Cowart's subsequent death could draw the reasonable inference that it was the long period of unchecked bleeding that caused Cowart's death.

The plaintiffs, however, are trying to answer the wrong question. They do not allege that Widener caused Cowart's internal bleeding; the parties stipulated that he died of natural causes. Rather, the plaintiffs allege that Widener failed to secure medical assistance in time to stop the internal bleeding from killing Cowart.[2] Thus, the

---

Dissenting Op. at 640, but rather endorsing the use of the term with the qualifier "specialized" to ensure that it is understood as a legal term of art rather than in its everyday sense, which is overbroad in the simple negligence context.

[2] To succeed on a tort claim based on a failure to render aid, the plaintiff must show that the defendant had a legal duty to render aid. See *Allen v. Hixson*, 111 Ga. 460, 460 (36 SE 810) (1900) ("No cause of action arises from a failure to perform an act of humanity, if such failure involves no breach of a duty imposed by law."); Restatement (Second) of Torts § 314 (1965) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). The parties dispute this issue, but the trial court did not address it in its summary judgment order.

causation they must show to prevail on their wrongful death claim is not that *internal bleeding* caused Cowart's death, but rather that *Widener* caused Cowart's death by failing to render or seek assistance for Cowart. " 'The defendant's conduct is not a cause of the event, if the event would have occurred without it.' Prosser, Law of Torts (4th Ed. 1971), 239." *Gen. Motors Corp. v. Davis*, 141 Ga. App. 495, 496 (233 SE2d 825) (1977). Accord *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003). In their motion for summary judgment and supporting materials, the defendants have "point[ed] out by reference to the evidence in the record that there is an absence of evidence" on this properly understood element of the plaintiffs' case, *Cox Enterprises*, 274 Ga. at 803, and the plaintiffs have failed to "point to specific evidence," expert and non-expert, from which a jury could reasonably conclude by a preponderance of the evidence that Widener's conduct proximately caused Cowart's death. *Lau's Corp.* 261 Ga. at 491; OCGA § 9-11-56 (e) ("When a motion for summary judgment is made and supported as provided in this Code section, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Code section, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.").

(b) Like the dissent, the plaintiffs do not specify the point in time at which Widener knew or should have known that Cowart needed immediate medical attention. The undisputed facts show that it was not uncommon for Cowart to cough up small amounts of blood, and that he had resisted entreaties from his sister (Widener's wife) to seek medical attention when he did so. There is nothing in the record evidence that would indicate to a reasonable person in Widener's position that, as he drove to Lexington, Cowart's bloody spittle and complaint about his throat closing in indicated major internal hemorrhaging of the type that the evidence suggests killed him, as opposed to the minor esophageal oozing of blood that was a part of his normal day-to-day life. Nor did Cowart demonstrate any unusual concern about his condition, going to lie down instead of asking Widener to seek medical assistance, much as Cowart had done at home the previous morning when he experienced similar symptoms. There is simply no evidence in the record indicating that Widener should have realized that this time was different — until Widener

---

The Court of Appeals also did not address the issue, and we need not either in light of our holding that the trial court properly granted summary judgment based on the causation element.

began to smell the foul odor as he approached Lexington, pulled over to check on Cowart, and found him already dead.

It is true, as the plaintiffs argue, that no expert testimony is needed to enable a jury to determine that one left to bleed uncontrollably for hours may die. But it is just as true that there is a big difference between internal bleeding and external bleeding when it comes to its observation by other people. When a person is profusely bleeding *externally*, a jury may be able to infer a causal link between a failure to secure medical assistance for the individual by one who has a duty to render aid and the individual's death shortly thereafter. That is a medical question about causation that lay jurors are qualified by experience and common sense to answer. The same would be true of someone who has been shot and suffered more than a "flesh wound," who is unresponsive after being knocked unconscious, who is visibly unable to breathe, or who is clutching his chest in pain while suffering a possible heart attack. These are all external signs that an average person would understand to signify that a person is in deep physical distress requiring prompt medical assistance.

But the same often cannot be said of internal bleeding, no matter how profuse, unless that condition is revealed externally or has an observed traumatic cause, and there is no evidence of either in this case. Indeed, the expert testimony in the record indicates that an individual hemorrhaging internally may be unaware of his own condition. The average bystander would have no way of knowing there was a serious problem, much less be able to determine the point at which emergent medical care should be sought, unless that person manifested his distress. One can imagine scenarios involving internal bleeding where it would be obvious to the average person that medical attention is needed — for example, where a person sees someone get hit by a fast-moving car or suffer other major blunt-force trauma. Under these circumstances, even if there were no significant external injuries, a jury might conclude that a reasonable person with a duty to care would realize the need to seek immediate medical assistance due to the possibility of internal injuries.

That is far from the situation here, however. A jury could not find a causal relationship between Widener's failure to render aid at the time the undisputed evidence shows that he first observed Cowart in real distress, at the truck stop in Lexington, and Cowart's death from internal bleeding, which occurred sometime before that, between their interaction near the Tennessee-Kentucky border and their arrival in Lexington.

(c) The dissent does not contend that there is any material evidence in the case beyond what we have just reviewed. Instead, the dissent argues that Widener's "self-serving statements about the

extent of Cowart's external symptoms" should be disregarded because, even after he says that he discovered Cowart dead and smelling awful near Lexington, he continued driving with the body for several hours to Ohio. Dissenting Op. at 639. The dissent does not point to any evidence that actually contradicts Widener's account of what happened in his truck — no expert evidence that Cowart would have displayed more serious external symptoms before he died; no dispute with the testimony of Widener's wife, whom he did not call until he stopped near Lexington and who confirms that Widener said that her brother was non-responsive at that time; no inconsistent physical evidence, such as an indication that Cowart was actually bleeding profusely in the truck; nothing. Nor is this a case where the witness's sworn testimony is self-contradictory on a material point without explanation, which requires the court to disregard the portions of the testimony that favor the moving party. See *CSX Transp. v. Belcher*, 276 Ga. 522, 523 (579 SE2d 737) (2003). Widener's account of Cowart's external symptoms and the sequence of events has been consistent. Moreover, while Widener's conduct after finding Cowart dead was unusual, he explained that he was concerned about how his brother-in-law's dead body would get back to Georgia if he did not bring it with him in his truck. Given that Cowart was penniless and uninsured, it was not outlandish to wonder what would happen if the dead body were reported in Kentucky (where the authorities surely would not have allowed Widener to drive it away in his truck). After all, Widener and his wife had taken Cowart in when he was broke and homeless, which is hardly the conduct of someone unconcerned with his well-being.

We fully agree with the dissent that " 'where material issues can be eliminated only by making credibility judgments, the movant has not met his burden.' " Dissenting Op. at 639 (quoting *Holmes v. Achor Center*, 249 Ga. App. 184, 192 (547 SE2d 332) (2001)). But that rule applies where what one witness says on a material point is genuinely contradicted by some other evidence — what another witness says, a prior statement by the witness, or a document or other piece of physical evidence. See, e.g., *Holmes*, 249 Ga. App. at 192 ("Since accepting Officer Smith's version of events requires rejection of versions presented by Holmes and his wife, we cannot say the evidence is undisputed that Holmes made any such admission to the officer."). The rule does *not* mean that a witness's uncontradicted testimony can simply be disbelieved in order to eliminate the evidence it provides. Summary judgment cannot be avoided based on speculation or conjecture; once the pleadings are pierced with actual evidence, the plaintiff must point to admissible evidence showing a genuine issue of fact. See *Butler v. Huckabee*, 209 Ga. App. 761, 762-763 (434 SE2d 576) (1993) (affirming summary

judgment in a negligence case where "the only admissible evidence of the speed of [Huckabee's] truck was Huckabee's statement" that he was driving below the speed limit, where the plaintiff's testimony that the defendant " 'must have been going awfully fast for me not to see him coming' " was inadmissible conjecture). Indeed, if the dissent's approach were the law, summary judgment would be rendered virtually non-existent in cases where the evidence comes from witnesses.

The federal courts, interpreting a virtually identical summary judgment rule, have clearly expressed this view. Thus, the Supreme Court of the United States has explained that, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (106 SC 2505, 91 LE2d 202) (1986), that does not mean that

> a plaintiff may defeat a defendant's properly supported motion for summary judgment . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of [wrongdoing]. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict.

*Id.* at 256. See also *Cox v. Ky. Dept. of Transp.*, 53 F3d 146, 150 (6th Cir. 1995) ("[A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence. Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment."); *Rinieri v. Scanlon*, 254 FSupp. 469, 474 (S.D. N.Y. 1966) ("All these cases support the proposition, applicable here, that the party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and that the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."). This rule applies even where the relevant evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery, as occurred in this case. See *Anderson*, 477 U. S. at 257.

Thus, contrary to the dissent's claims, Widener's testimony cannot simply be disregarded because his version of events could be

disbelieved, in the absence of any concrete, contradictory evidence.

(d) Even if the dissent's argument that Widener's testimony should be disregarded were viable, however, summary judgment would be proper. Indeed, the defendants focus on this related aspect of the causation question, which involves specialized medical questions. They argue that in order to establish the necessary causal link between Widener's inaction and Cowart's death, the plaintiffs would have to show not only that Cowart died from internal bleeding, but also that he would not have done so had he received care after Widener realized that he was seriously ill (and assuming Cowart was still alive at that point). As the defendants correctly note, for a jury to determine that prompt medical attention would have saved Cowart's life, it would have to make factual decisions on a number of points that the evidence in the record is insufficient to allow it to make. This is true even if Widener's uncontradicted testimony is included in the evidence. If the jury were to "reject *everything* he claims, including the point of time at which Widener 'realized' Cowart could use medical assistance," Dissenting Op. at 640 (emphasis in original), then the absence of causation proof becomes even more apparent. Under the dissent's view, the record would be virtually devoid of information about Cowart's symptoms, whether and when they would have been observable by Widener, how Widener responded, and whether any response would have mattered, between the time the truck left Augusta on the afternoon of November 30 and the time it was stopped in Ohio early on December 2.

Some of these determinations involve specialized medical questions whose resolution requires expert knowledge, such as the source of Cowart's allegedly fatal internal bleeding, when it began and how rapid it was, and how much of it had already occurred when the first external symptoms appeared; whether his condition was treatable at all, whether such treatment could have been provided by Widener based on advice obtained by phone or radio (if he had access to those devices), by emergency responders, or by an emergency room, and whether that treatment could be rendered in time. All of these unanswered questions relate to the same dispositive point: whether Cowart would have bled to death no matter how quickly Widener had sought medical care for him, once Cowart displayed distress that would have alerted a reasonable person to the need to render aid. Some of these specialized medical questions might also need a foundation in non-expert facts, such as how close Widener was to emergency care. In many cases a jury might resolve that question based on their common sense and experience, but the question is not easily answered in this case, because the incident happened on an interstate highway rather than in a setting with many medical facilities.

A jury could not rely on its common sense and experience to answer these causation questions — particularly if it disregarded Widener's account — and without those answers, the plaintiffs could not meet their burden to show that Widener's breach of duty in failing to take Cowart in for treatment proximately caused his death. Indeed, the only arguably expert evidence on the issue weighed *against* causation, as Cowart's treating physician admitted that he could *not* say if Cowart would have survived had he been taken to an emergency room. The dissent notes that this opinion was based on the time line of events that Widener provided. See Dissenting Op. at 639. That is true, but we believe that the physician could consider Widener's uncontradicted testimony. More importantly, there is no opinion in the record from this physician or any other expert that could *support* a finding of causation — no expert evidence regarding the external symptoms that Cowart's condition would have generated to alert Widener, the timing of his demise, or the ability of Widener or anyone else to do anything about it. As the trial court properly concluded, speculation is not enough. See *Berry v. Hamilton*, 246 Ga. App. 608, 610 (541 SE2d 428) (2000) (holding that "mere conjecture" is insufficient to defeat summary judgment); *Shadburn v. Whitlow*, 243 Ga. App. 555, 556 (533 SE2d 765) (2000) (" '[A]n inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.' " (citation omitted)).

(e) Finally, the plaintiffs seek to rely on *Self*. In that case, the plaintiff's husband was admitted to Georgia Baptist Hospital for treatment of acute leukemia. See 245 Ga. at 548. Two days later, a member of the patient's family noticed water leaking from one of the fixtures in the patient's bathroom and notified hospital staff. See *Self v. Exec. Comm. of the Ga. Baptist Convention of Ga.*, 151 Ga. App. 298, 298 (259 SE2d 695) (1979). After the staff attempted to repair the leak, the patient went to the bathroom, where he slipped and fell and hit his head. See id. He died several hours later. Family members filed affidavits stating that the patient had been improving since his admission to the hospital but that his condition deteriorated after the fall. See id.

The patient's wife sued the hospital for negligence, and the hospital filed a motion for summary judgment. See id. In support of its motion, the hospital produced deposition testimony from the doctor hired by the hospital to conduct the autopsy, who opined that the patient died from intracerebral hemorrhaging characteristic of patients with acute leukemia, and that the fall could not have accelerated his death. See id. at 298-299. In addition, the hospital produced the patient's death certificate, prepared by a different doctor, which listed the cause of death as "massive right sided

intracerebral hemorrhage with cerebral edema and herniation of cerebellar tonsils" due to acute leukemia. See id. at 299.

The plaintiff did not produce any contrary expert evidence, and there was some question about whether that would have even been possible once the hospital's employee had autopsied the patient's head and brain and the body had been buried. See id. at 300-301 (Banke, J., concurring specially). The trial court granted summary judgment in favor of the hospital, and the Court of Appeals affirmed. This Court reversed on certiorari. See *Self*, 245 Ga. at 549.

As discussed previously, in *Self* we said that "[t]here is no requirement that expert testimony must be produced by a plaintiff to a negligence action in order to prevail at trial. The weight given to expert testimony in such cases is for the trier of fact, who is not required to give it controlling influence." Id. at 549. That remains the general rule for simple negligence cases, although the statement is overly broad in isolation, as discussed above. But *Self* is very different from this case.

In *Self*, it was alleged that the hospital's negligence caused the patient's death; it was not a failure to render care case. A lay jury may reasonably infer a causal link between a sharp blow to the head of a patient whose condition appeared to be improving and his death from bleeding in his head a few hours later. A defense expert may create a material issue as to whether the blow was the actual cause of death, but in that event, the jury resolves the disputed fact; it does not require summary judgment for the defendant. Nothing like that occurred here, and it would be pure speculation for a jury to conclude on the evidence in this record that Widener's acts and omissions in failing to seek care were a cause-in-fact or a proximate cause of Cowart's death, from a cause not known to Widener, triggered at an uncertain time and occurring at an unknown rate, and not observed by Widener until it was too late to make a difference.

(f) By holding that summary judgment was properly granted by the trial court and properly affirmed by the Court of Appeals, we are neither "display[ing] disdain for our jury system," Dissenting Op. at 638, nor expressing any distrust whatsoever "in our Georgia juries to make . . . credibility determinations." Id. at 640. We are instead displaying our respect for the law of Georgia, including the summary judgment statute enacted by the General Assembly, which directs that a jury need not be called upon to decide a case where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c).

*Judgment affirmed. All the Justices concur, except Thompson, J., who concurs in Divisions 1 and 2 and in the judgment, and Hunstein,*

*C. J., Carley, P. J., and Benham, J., who concur in part and dissent in part.*

HUNSTEIN, Chief Justice, concurring in part and dissenting in part.

I respectfully dissent to the majority's affirmance of the grant of summary judgment in favor of appellees. The majority fails to apply the proper standard of review to summary judgment cases and improperly construes the evidence in favor of appellees, the respondents. I would reverse because a de novo review of the evidence applying the proper standards establishes that genuine issues of material fact remain for a jury to decide.

1. To prevail on a motion for summary judgment, the burden is on the moving party to demonstrate the absence of any genuine issue of material fact and that the movant is entitled to judgment *as a matter of law. Kaplan v. City of Sandy Springs*, 286 Ga. 559 (1) (690 SE2d 395) (2010). We recently reiterated in *American Multi-Cinema v. Brown*, 285 Ga. 442, 445 (2) (679 SE2d 25) (2009) that negligence issues are "generally not susceptible of summary adjudication, and that summary judgment is granted only when the evidence is plain, palpable, and undisputed." (Footnote omitted.) In our de novo review of the grant of a motion for summary judgment, we must "view the evidence, *and all reasonable inferences drawn therefrom,* in the light most favorable to the nonmovant." (Emphasis supplied.) *Kaplan v. Sandy Springs*, supra at 560 (1). While the majority recites the proper standards on summary judgment, it then ignores these standards completely by accepting appellees' version of events without question. By doing so the majority displays its disdain for our jury system by making credibility determinations that have heretofore been within the exclusive realm of the factfinder.

The deposition testimony of Widener by itself shows that a triable issue of material fact exists in this case. Widener claimed that Cowart, an unauthorized passenger in Widener's tractor trailer truck, said and did nothing to indicate to Widener that he needed medical attention. Because the two men were alone in the truck, the majority accepts Widener's statements as undisputed. Those statements, however, must be assessed in light of all of the facts. Most significant is the fact that, even after discovering in Lexington, Kentucky that Cowart had actually *died* in his truck, Widener nevertheless continued driving to Ohio, which required him to endure hours of the "extremely foul odor" emanating from the body in the rear seat of the cab. Indeed, but for the accident he caused at a truck stop in Ohio, which led to the state trooper's discovery of Cowart's body, it appears that Widener would have completed the delivery of his cargo in Ohio. Given Widener's testimony that he

would not let the *death* of a passenger delay his delivery, the record evidence supports a reasonable inference that Widener would not have let *anything* stop him from making his delivery.

Widener's own account of his "Ohio or bust" behavior could thus call into question the credibility of his self-serving statements about the extent of Cowart's external symptoms. A jury could reasonably infer that Widener minimized Cowart's condition in his testimony in order to justify his decision to deliver his cargo at any cost. An additional reason exists for a jury to discount Widener's credibility on this issue in that, had delivery of Widener's cargo been delayed for the purpose of seeking medical assistance for Cowart, the presence of an unauthorized passenger in Widener's truck would then have to be explained to UTI. While a jury might possibly believe Widener's unusual explanation for keeping Cowart's body in his truck, i.e., that he was concerned about how the body would get back to Georgia if he did not bring it with him, see Maj. Op., p. 625, or his explanation for downplaying his violation of UTI's unauthorized passenger policy,[3] it is for the jury, not this Court, to make these determinations.

By taking Widener's statements at face value, the majority makes a credibility judgment that is reserved exclusively for the finder of fact. "[T]he movant for summary judgment carries the burden to eliminate material issues of fact, and where material issues can be eliminated only by making credibility judgments, the movant has not met his burden." (Punctuation and footnote omitted.) *Holmes v. Achor Center*, 249 Ga. App. 184, 192 (2) (b) (547 SE2d 332) (2001). Based on Widener's admitted single-minded behavior in seeking to deliver his cargo, I would instead recognize that a reasonable jury could find as lacking in credibility Widener's claims about the absence of any external symptoms shown by Cowart.

Contrary to the majority's argument, the credibility problems with Widener's own deposition testimony undermine not only the majority's finding about causation but also its finding that Widener's failure to render aid made no difference in preventing Cowart's death. The majority points to Cowart's treating physician's statement that "he could not say if Cowart would have survived if he had been taken to an emergency room." Maj. Op., p. 636. But that statement is predicated exclusively upon the time line of events Widener provided, i.e., *"after Widener realized that [Cowart] was seriously ill."* (Emphasis supplied.) Maj. Op., p. 635. The only source we have for knowing *when* Widener "realized" Cowart was seriously

---

[3] In his deposition Widener asserted that Cowart's status as an ex-UTI employee meant there would be no objection to Cowart's presence.

ill is *Widener himself.* Because Widener's credibility is in issue, a jury after hearing and seeing him testify may reasonably reject *everything* he claims, including the point of time at which Widener "realized" Cowart could use medical assistance. Indeed, summary judgment based on the treating physician's opinion would have been appropriate here only in one circumstance: had he opined that Cowart would have still died even had he gone directly to an emergency room *rather than enter Widener's truck in the first place.* But the treating physician did not express such an opinion and instead predicated his opinion on the same self-serving statements by Widener on which the majority relies. Summary judgment is thus no more warranted based on the physician's opinion than on Widener's own statements.

I would leave to jurors who have seen and heard Widener testify before them to decide whether to believe Widener's account of the events leading to Cowart's death. Unlike the majority, I trust in our Georgia juries to make these types of credibility determinations. Summary judgment as a matter of law is simply not appropriate in this case.

2. I will not quibble with the majority over its rejection of the phrase "medical question" due to its "everyday meaning" and "common parlance," Maj. Op., p. 627, despite the fact that, as attorneys and jurists, we routinely employ "everyday" words as terms of art. Although I doubt that the majority's re-labeling of this phrase meaningfully advances the law, I agree with the majority's ultimate conclusion that expert testimony may be required when, under the facts of the particular case, a determination whether the defendant's conduct proximately caused the plaintiff's injury is a matter beyond the ken of the average juror.

For these reasons, I respectfully dissent to Division (3) of the majority's opinion, concur in Division (2) (a) and concur in judgment only in Division (2) (b).

I am authorized to state that Presiding Justice Carley and Justice Benham join in this concurrence in part and dissent in part.

DECIDED JULY 12, 2010 —
RECONSIDERATION DENIED JULY 26, 2010.

*Warlick, Tritt, Stebbins & Murray, Charles C. Stebbins III,* for appellants.
*Sommers, Scrudder & Bass, Henry E. Scrudder, Jr., Fortson,*

*Bentley & Griffin, J. Edward Allen, Jr., Fulcher Hagler, John A. Davison, Amy R. Snell, Charles C. Mayers*, for appellees.