**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 30, 2012**

# In the Court of Appeals of Georgia

A12A1249. BARRETT et al. v. BRITT et al.                    AD-057

ADAMS, Judge.

Jimmy and Marilyn Barrett appeal the trial court's order granting partial summary judgment to Melanie Willis Britt and William Stacey Britt on the Barretts' claims for breach of contract, waste and conversion in connection with their purchase of real property formerly owned by the Britts. The Barretts' complaint asserted that the Britts improperly removed certain property, equipment and/or fixtures from the property at issue. Because we find that material issues of fact remain on the Barretts' claims, we reverse the trial court's grant of partial summary judgment to the Britts.

"In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *Cowart v.*

*Widener*, 287 Ga. 622, 623 (1) (a) (697 SE2d 779) (2010). So viewed, the record reflects that on July 25, 2006, the Britts, pursuant to a Purchase and Sale Agreement (hereinafter the "Britt Agreement"), sold certain Jackson County real property, with improvements thereon, to their co-defendant Roger Allen Hughes ("Hughes"). The Britt Agreement contained a stipulation providing that "[a]ll Equipment having to do with the cattle operation still belongs to the seller" but did not identify or define such equipment. One year later, on July 26, 2006, the Britts and Hughes executed "Amendment #1" to the Britt Agreement, which provided that

> [f]or a period of up to three (3) years, [the Britts have] the right to use the property for the purpose of managing their existing Cattle business. During the time the [Britts] are using the property they agree to maintain same to the condition it is presently in.

Two months later, on August 25, 2006, the parties entered into a formal "Lease Agreement" for the Property, "pursuant to the terms and conditions of" the Britt Agreement as amended. The Lease Agreement provided:

> The terms of the [Britt Agreement], as amended, allow the [Britts] to retain possession of the property for a period of up to three (3) years following the date of closing, subject to the provisions of special stipulations set forth in the [Britt Agreement, as amended]. In order to

2

confirm their agreements, the parties hereto have agreed upon and hereby enter into this lease . . . .

The property covered by the Lease Agreement is identified by the legal description of the Property. And under the terms of the lease, the Britts undertook "to maintain the property in a good condition, substantially the same as at present through the term of this lease," including any "necessary maintenance on the house or other improvements, and the systems and appliances related thereto."

During the pendency of the lease, however, Hughes sold the Property to the Barretts, pursuant to a Purchase and Sales Agreement dated September 19, 2007 (the "Barrett Agreement"). Under that agreement, Hughes warranted that at the time the Barretts took possession, the Property "will be in substantially the same condition" as on the day the parties signed the agreement. The Barrett Agreement provided for the sale of the Property "with such improvements as are located thereon . . . together with all fixtures, landscaping, improvements, and appurtenances," but made no specific reference to Hughes's earlier agreement entitling the Britts to retain ownership of any equipment "having to do with the cattle operation." Nevertheless, the sale to the Barretts was specifically made subject to the Lease Agreement between Hughes and the Britts. The Barretts acknowledge that they received a copy of the

3

Lease Agreement prior to closing, and that agreement references the Britt Agreement and the stipulations contained therein, without addressing the content of the stipulations. No other limitations on title were mentioned in the Barrett Agreement. The sale of the Property from Hughes to the Barretts closed on March 31, 2008, and the Warranty Deed Hughes signed that day granted the Barretts title in fee simple.

At the time of closing, the Britts still had 17 months remaining under the lease. When the Barretts took possession of the property on or about July 31, 2009, at the end of the lease term, they discovered that the Britts had removed "the custom built galvanized steel gates; the custom built steel partitions in the barn for the stables; a grain bin attached to the barn; water meters, devices and water lines; and a cupola and weather vane." Marilyn Barrett averred that, based upon her experience as a purchaser and owner of "numerous residential and commercial properties," the property removed by the Britts was not cattle equipment or equipment related to the operation of a cattle business. The Britts concede that they removed "102 pieces of river run panel/gates, river run chute, 1 feed bin, 3 nelson waters, 3 blue automatic waters, 6 fans, 1 barn cupola, 12 feed bunks and 1 fuel tank and pump," but William Britt averred that this property was associated with their cattle operation.

The Barretts contend that the removal of these items drastically altered the Property from its condition at the time they inspected and purchased it in 2008. And in August 2009,the Barretts sent the Britts correspondence detailing the items that they contended needed to be repaired, replaced or removed pursuant to the Lease Agreement and notifying them of damage caused by the removal of the cupola and weather vane. The Britts replied that they were entitled to remove the property pursuant to Stipulation 7 of the Britt Agreement, and supplied the Barretts a copy of that agreement in September 2009.

This lawsuit ensued, and the Britts filed a motion for summary judgment on the Barretts' claims. The trial court granted the Britts summary judgment as to the Barretts' claims regarding the removed property, finding that the Britts had the right to remove such property under the terms of the Britt Agreement and the Lease Agreement. The trial court denied summary judgment, however, on the Barretts' claims that the Britts breached their duty to maintain the property as to certain items; that the Britts dumped harmful substances on the property in violation of the lease, resulting in damages; that the Britts' removal of property was done negligently, resulting in damage to the property; and that the Britts are liable for punitive damages and attorney fees.

On appeal the Barretts argue that the trial court erred in finding as a matter of law 1) that the property removed from the property was "equipment having to do with the cattle operation;" and 2) that the Britts were entitled to remove any fixtures from the Property.

The Barretts correctly argue that fixtures ordinarily pass with the conveyance of underlying real estate, but the parties to a conveyance may alter that general rule by contract:

> Where an item is attached to the land it becomes a part thereof and would ordinarily pass in a conveyance of the land. Whether certain articles annexed to the realty shall pass by conveyance or not, as between grantor and grantee, may be controlled by the agreement of the parties. The parties may, by an extrinsic and collateral agreement to the instrument of conveyance, treat such articles as personalty or realty.

> Aside from the general rule of physical attachment and removability, the intent of the parties is to be considered when deciding issues of the law of fixtures. Where there is a contract by the express or implied terms of which such fixtures are to be considered as personalty they will be so treated.

(Citations and punctuation omitted.) *Hargrove v. Jenkins*, 192 Ga. App. 83, 84 (383 SE2d 636) (1989). See also *Burpee v. Athens Production Credit Assn.*, 65 Ga. App. 102 (15 SE2d 526) (1941).

Stipulation 7 of the Britt Agreement was an attempt to identify items as to which the Britts retained ownership even after the sale of the real property to Hughes. And the Barretts are bound by the language of Stipulation 7. The Barrett Agreement was expressly made subject to the terms of the Lease Agreement, and that agreement, which the Barretts acknowledged receiving prior to closing, incorporated and affirmed the special stipulations found in the Britt Agreement. It is clear, therefore, that the Barretts purchased the Property subject to the Britts' rights under the Lease Agreement. *Turner Communications Corp. v. Hickcox*, 161 Ga. App. 79, 82 (1) (289 SE2d 260) (1982) ("Where one purchases realty from a landlord, he takes with notice of whatever right or title the tenant in possession at the time may have.") (citation and punctuation omitted). Thus, this appeal turns on an interpretation of the language in Stipulation 7 providing that the "equipment having to do with the cattle operation still belongs" to the Britts.

To determine the parties' intent in drafting this language, we apply the well-settled rules of contract construction:

[T]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. The existence or nonexistence of an ambiguity is a question of law for the court. If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of construction in OCGA § 13–2–2.

(Citations and punctuation omitted.) *Woody's Steaks v. Pastoria*, 261 Ga. App. 815, 817 (1) (584 SE2d 41) (2003).

Because the Britt Agreement failed to identify the equipment covered by Stipulation 7, we agree with the trial court that the stipulation's language is ambiguous. We find, however, that the trial court erred in its application of the rules of contract construction in attempting to resolve that ambiguity and in determining as a matter of law that the items removed by the Britts fell within the terms of the stipulation.

8

The trial court applied the statutory rules of contract construction providing that "[w]ords generally bear their usual and common signification" and "the rules of grammatical construction usually govern." OCGA § 13-2-2 (2) & (6). But in attempting to determine the "usual and common signification" of the word "equipment," the trial court erroneously relied upon the definition of that term found in Article 9 of Georgia's Uniform Commercial Code, dealing with secured transactions in, inter alia, personal property or fixtures. See OCGA § § 11-9-102 (34), (42) and (45). It is well-settled that the provisions of the UCC have no application to contracts involving real estate, such as those here. See *Gordon v. South Central Farm Credit*, 213 Ga. App. 816, 818-819 (446 SE2d 514) (1994) (UCC inapplicable to real estate mortgage contract); *Lake Tightsqueeze v. Chrysler First Financial Serv. Corp.*, 210 Ga. App. 178, 180 (4) (435 SE2d 486) (1993) (UCC inapplicable to agreement for future financing of real estate). Cf. *Thogerson v. State*, 224 Ga. App. 76, 77 (479 SE2d 463) (1996) (UCC definitions inapplicable in criminal prosecution).

Rather, the plain meaning of "equipment" generally includes any "articles or implements used for a specific purpose or activity (esp. a business operation)." Black's Law Dictionary 617 (9th ed. 2009); see also Merriam-Webster Online Dictionary (11th Ed. 2012), http://www.m-w.com, equipment (equipment means "the

9

implements used in an operation or activity . . . ."); See also *Beyer v. Rieter Automotive North America*, 973 NE2d 318, 320 (Ohio App. 6 Dist. 2012) ("equipment" is defined as "the implements (as machinery or tools) used in an operation or activity(.)") (citations and punctuation omitted). From these sources, we could interpret the term "equipment" to mean articles, implements or other items of personalty. But these and other sources also provide broader definitions of the term. For example, we note that Merriam-Webster includes a second definition of "equipment" as "all the fixed assets other than land and buildings of a business enterprise . . . ." http://www.m-w.com, equipment, def. 2. See also Random House Unabridged Dictionary 656 (2d ed.1993) (defining equipment as "anything kept, furnished, or provided for a specific purpose"). Thus, the ambiguity in Stipulation 7 remains even after we apply the rules of construction, and we conclude that a jury must determine the parties' intent in drafting that language.[1]

---

[1] Similarly, we find that the trial court erred in determining as a matter of law that the qualifying language "having to do with the cattle operation," was not intended to limit the term "equipment" to that used "solely" for the cattle operation. We find that this phrase is ambiguous, and the grammatical analysis employed by the trial court is insufficient to resolve this ambiguity. Moreover, the language of Section 7 must be construed as a whole and in conjunction with the entire agreement between the parties. OCGA § 13-2-2 (4) ("the whole contract should be looked to in arriving at the construction of any part"). We conclude, therefore, that it is for the jury to determine the parties' intent in drafting Stipulation 7.

Moreover, even if we were to settle on one definition as the "usual and common signification" of the term "equipment," we find that the trial court erred in determining as a matter of law that the items taken from the property constituted "[e]quipment having to do with the cattle operation" because the record below is conflicting on this point. Marilyn Barrett averred, based upon her prior history as a purchaser and owner of property, that the items taken were not cattle equipment or equipment related to the operation of a cattle business. In contrast, William Britt averred that the items were associated with his cattle operation. Neither party offered any additional evidence to support these blanket statements. "Despite the apparent self-serving nature of the[se] affidavit[s], whether th[e] testimony is credible is not an issue that the trial court can determine on summary judgment." *Shell v. Tidewater Finance Co.*, __ Ga. App. __ (Case No. , decided October 17, 2002). See also *Crossing Park Properties v. Archer Capital Fund*, 311 Ga. App. 177, 183 (2) (715 SE2d 444) (2011); *Peach Blossom Dev. Co. v. Lowe Elec. Supply*, 300 Ga. App. 268, 271 (684 SE2d 398) (2009) (trial court cannot discount affidavit because it is self-serving).[2] Thus, the parties' conflicting affidavits present an issue of fact as to

---

[2] Indeed, if the trial court disregarded the affidavits, the record would be devoid of any evidence regarding the nature of the items removed from the Property, and the trial court would have nothing upon which to decide the issue as a matter of law.

whether the items removed constitute equipment "having to do with" the Britts' cattle operation.

On motion for summary judgment, the Britts, as movants, had the burden of "establishing the non-existence of any genuine issue of fact," and "all doubts are to be resolved against [them]." (Citations and punctuation omitted.) *Hadley v. Countrywide Home Loans*, 315 Ga. App. 349, 353 (1) (727 SE2d 183) (2012). Because the Britts failed to carry their burden, the trial court erred in granting them partial summary judgment.

*Judgment reversed. Barnes, P. J., and McFadden, J., concur.*