**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A1520. AYERS v. ASSOC. OF COUNTY COMMISSIONERS OF GEORGIA-INTERLOCAL RISK MANAGEMENT AGENCY.

BARNES, Presiding Judge.

This appeal addresses the trial court's order in a declaratory judgment as to coverage in a case involving the shooting death of a victim by a deputy sheriff. The trial court determined that coverage was limited to the liability limits of $1 million contained in an insurance policy issued to one of three counties that participated in a drug task force initially funded by a grant from the federal government. The plaintiff appeals this order. For the reasons that follow, we affirm.

Jonathan Paul Ayers was shot and killed by Billy Shane Harrison, who was a Stephens County deputy working for the Mountain Judicial Circuit Narcotics Criminal Investigation and Suppression Team ("the NCIS Team"), which covered Stephens County, Habersham County, and Rabun County. In her capacity as Ayers'

surviving spouse and the administratrix of his estate, Abigail Marilyn Ayers sued

Harrison and others in federal court under 42 U.S.C. §1983, but after the Eleventh

United States Circuit Court of Appeals reversed in part and affirmed in part the

district court's order on the parties' motions for summary judgment, the only claims

remaining were §1983 excessive force claims and state assault, battery, and false

arrest claims against Harrison. *Ayers v. Harrison*, 506 Fed. Appx. 883, 885 (11th Cir.

2013).

In its opinion affirming in part and reversing in part the district court's order

on the defendants' motions for summary judgment in the underlying case, the

Eleventh Circuit Court of Appeals summarized the facts then in the record as follows:

> Viewed in the light most favorable to Plaintiff [Ayers], the record
> reveals the following facts. Although Officer Harrison concededly did
> not have probable cause to arrest Ayers at the time, Officer Harrison,
> while in plain clothes as an undercover officer, approached Ayers's car
> at a gas station to investigate possible drug activity. Only Ayers, as the
> driver, was in the car. Taking together Ayers's dying declaration and
> eyewitness testimony, Officer Harrison did not identify himself to Ayers
> as a police officer, but drew his gun, either waved the gun at Ayers or
> tapped the gun on the car window, and told Ayers to get out of the car.
> Thinking that he was being robbed, Ayers attempted to drive out of the
> gas station, but Officer Harrison fired two shots at Ayers's car. The

2

second bullet pierced the windshield and struck Ayers in the abdomen, and he died shortly thereafter from the gunshot wound.

*Ayers,* 506 Fed. Appx. at 884.

The Association of County Commissioners of Georgia-Interlocal Risk Management Agency ("IRMA"), which had issued insurance policies to all three counties, defended Harrison in federal court under a reservation of rights letter which stated that the anticipated defense costs plus the requested damages may exceed its liability coverage of $1 million in the Stephens County policy.

After the Eleventh Circuit issued its opinion on the parties' summary judgment motions in February 2013, IRMA filed a petition for declaratory judgment against Harrison and Ayers in the Superior Court of Banks County in May 2013. IRMA asserted that it had been providing a defense for Harrison under the Stephens County policy under a reservation of rights, and further asserted that Ayers had contended that Harrison is also covered under insurance policies issued to Habersham and Rabun Counties and that the limits of all three policies may be stacked. IRMA thus sought a declaration that its maximum potential liability to indemnify Harrison in the civil rights suit was $1 million under the Stephens County policy, that Harrison was

3

not covered under either the Habersham or the Rabun County policies, and that those policies could not be stacked to provide an additional $3 million in coverage.

Ayers removed the declaratory judgment to the Northern District of Georgia, but the district court granted IRMA's motion to remand the case to the superior court, finding that Ayers had failed to show federal jurisdiction over the matter. *Assoc. County Commn. of Ga.-Interlocal Risk Mgmt. Agency v. Harrison*, Civil Action No. 2:13-CV-00107-RWS (N.D. Ga., June 27, 2013).

Following discovery, the parties filed cross-motions for summary judgment. IRMA argued that its potential exposure should be capped at the limits of the liability policy issued to Stephens County because (1) Harrison was not covered under the Rabun County or Habersham County policies, and (2) even if he were covered, the policies contain anti-stacking provisions. Ayers argued that IRMA sought an improper advisory opinion because it had already denied coverage to the deputy under its Habersham and Rabun County policies and its duty to indemnify Harrison had not yet arisen absent a final judgment on Ayers' claim. She also argued that Harrison was covered under all three policies and that they do not contain anti-stacking provisions.

4

The trial court denied Ayers' motion for summary judgment and granted IRMA's motion, first finding that IRMA's reservation of rights letter was adequate to show its uncertainty as to whether the policies could be stacked, and thus IRMA's petition for declaratory judgment stated a claim. The court continued, "Turning to the question of coverage, the Court finds that, for all of the reasons set forth by [IRMA, its] total liability in the underlying case cannot exceed the $1 million limit of the Stephens County Policy."[1]

Ayers contends on appeal that the trial court erred in granting summary judgment to IRMA and denying summary judgment to her, arguing that each county's policy "simultaneously and collectively provide coverage for the underlying occurrence." She asserts that (1) Harrison was insured under each policy because he was acting on behalf of all three counties, under the supervision of the NCIS Team commander, when the shooting occurred, and that (2) the policies do not contain anti-stacking language.

---

[1]The underlying federal case was tried in early 2014, and the jury returned a damages verdict in Ayers' favor of $2,305,352, which the district court affirmed after post-trial motions. *Ayers v. Harrison*, Civil Action No. 2:10-CV-0032-RWS (N. D. Ga., April 23, 2014). The district court subsequently granted $710,998 in attorney fees and $121,202 in expenses to Ayers. *Ayers v. Harrison*, Civil Action No. 2:10-CV-0032-RWS (N. D. Ga., June 13, 2014).

"On appeal from the grant of summary judgment this [c]ourt conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Citation omitted.) *Donovan v. State Farm Mut. Auto. Ins. Co.*, 329 Ga. App. 609, 610 (765 SE2d 755) (2014).

So viewed, the record shows that the NCIS task force was created by a Memo of Intergovernmental and Intra-agency Agreement for Grant Year 2009-2010 that was signed by the sheriffs of Habersham, Rabun, and Stephens County, the district attorney for the Mountain Judicial Circuit, and the police chiefs of 12 municipalities within the counties. The Stephens County Sheriff's Office had previously been a member of a different task force, but Stephens County Sheriff Randy Shirley, who was elected to begin serving office in January 2009, withdrew from that task force and decided to join a task force to which the sheriffs of Rabun and Habersham Counties belonged. The task force was renamed the NCIS Team in the 2009 Agreement, in which the governing bodies of the counties and municipalities authorized the Habersham County Commissioner's office to apply for and receive federal funding to "implement[] and provide[] the resources necessary to facilitate the investigation, arrest, prosecution and conviction of drug and violent crime offenders

6

whose illicit activity impacts the collective jurisdictions." Habersham and Rabun Counties agreed to be "the implementing agencies . . . responsib[le] for assuring compliance with [the grant] program regulations and applicable local, state, and federal laws."

The Agreement provided that all of the NCIS Team's "operational and management policies shall be established and unanimously approved by a control group comprised of the primary executive officer of each participating agency," including "bylaws governing the conduct of its routine oversight responsibilities" and Standard Operating Procedures governing the activities of the Team. All personnel assigned to the team were required to meet or exceed certain minimal qualifications, training, and experience, and applicants would be disqualified for various reasons including drug use or certain prior convictions. The Agreement further provided that the signatories concurred with "the NCIS Team Strategic Plan attached to this 2009-2010 ... Grant ... Program," but no such plan is included in this record.

Finally, the Agreement set forth the NCIS Team budget for the 2009-2010 grant year. The budget indicates that each county and the City of Cornelia would each hire an agent and specified the annual salary each agent would receive. Each "hiring agency" was to budget 100 percent of its agent's salary but would be reimbursed for

a portion of that salary from the federal grant. The Agreement also provided that each of the three counties would pay a portion of the NCIS Team Commander and Secretary's salaries, and would be reimbursed at least in part by federal funds under a specific formula and order. All of the Team's operational expenses were to be paid from seized condemned funds, which were to be placed in the Team's Master Fund; each county would be apportioned funds to reimburse its "cash match requirement," but any remaining balance would be used by the Team "for continued drug and violent crime control initiatives" rather than used by the counties to supplement their local funding for law enforcement activities.

The NCIS Team received the federal grant of $291,000, and in May 2009 the Control Board, which consisted of the three county sheriffs, hired Kyle Bryant to serve as the NCIS Commander. Bryant was paid with federal grant money that passed to him through the host agency, Habersham County, and he reported to the Control Board, more specifically to the chair of the Board, who was Rabun County Sheriff Frank Andrews, Jr. In 2009 the NCIS Team was comprised of five officers in addition to Bryant: one from the National Guard's Counter-Drug Task Force who did not report directly to Bryant, one from each of the three counties and one from the City of Cornelia, the four of whom did report directly to Bryant.

8

Habersham County Sheriff Joseph Terrell testified that he, the Rabun County sheriff, and the district attorney decided to hire Commander Bryant, who was responsible for the day-to-day operations of the NCIS Team. Once an agent was hired by a county and assigned to the Team, that agent was detailed exclusively to the Team and was subject to Commander Bryant's oversight rather than to the oversight of the county sheriff's department that hired him.

In July 2010, Stephens County hired Harrison to be its agent assigned to the NCIS Team. Although Harrison was technically an employee of and paid by Stephens County, once hired, Harrison "immediately went under the auspices of the NCIS unit and their policies and procedures" and was "totally" under the control, direction, and supervision of NCIS Team Commander Bryant. Bryant issued Harrison his handgun and a shotgun. While each sheriff's deputy acquired state-wide arrest powers when sworn in by the county sheriff's office that hired him, as a courtesy the NCIS Team agents were also sworn in by the other two counties that were NCIS Team members. Accordingly, Harrison was sworn in as a deputy in Habersham and Rabun Counties in addition to Stephens County.

On the day of the shooting, Harrison was working undercover with another NCIS Team member, Ronnie Cronic, when they saw a drug dealer who had sold some

9

cocaine to a third agent lean into Ayers' car, and saw Ayers give the dealer some money. Harrison found the exchange notable because the dealer had told the third agent, Chance Oxner, that she was going to meet someone else to obtain more cocaine.[2] Cronic and Harrison retrieved Oxner from the Relax Inn, where he had executed the undercover buy, and Cronic, Harrison, Oxner, and a fourth agent met Commander Bryant in the courthouse parking lot. Harrison and Oxner got into Commander's Bryant's undercover Escalade to return to surveilling the motel, but after they passed the motel and turned around, Harrison realized that Ayers happened to be in front of them.

The agents watched Ayers pull into a convenience store and Bryant pulled the Escalade into a pawn shop parking lot across the street and turned to face the convenience store. When Ayers came out of the store and went to his car, Harrison told the others that he needed to go talk to Ayers to find out how he was involved with the drug dealer. Bryant pulled the Escalade into the convenience store parking lot and Harrison got out and approached Ayers, who put his car in reverse and backed

_____

[2]Oxner had been hired by and assigned to the Team by the Habersham County sheriff.

up quickly. Harrison fired his weapon twice into the car. Ayers drove out of the parking lot but was mortally wounded and died four hours later.

1. *Coverage under the Habersham County and Rabun County liability policies.*

Under the rules of contract interpretation, courts must attempt to give meaning to all provisions of the contract and look to "the whole contract … in arriving at the construction of any part." OCGA § 13-2-2 (4); see *Horwitz v. Weil*, 275 Ga. 467, 468 (569 SE2d 515) (2002). "Although an ambiguous insurance contract must be construed in favor of the insured, a court may not strain to find an ambiguity and must enforce an unambiguous contract as written." *Thornton v. Ga. Farm Bureau Mut. Ins. Co.*, 287 Ga. 379, 384 (2) (b) (695 SE2d 642) (2010). When construing a contract, "[w]ords generally bear their usual and common signification." OCGA § 13-2-2 (2).

The three IRMA policies at issue here contain the same language, differing only in their limits of liability for law enforcement activities and deductible amounts. Each policy identifies the "Named Member" as the county itself, and defines "Member" as used within the policy as follows:

VIII. MEMBER
It is agreed that the unqualified word "Member" wherever used in the Coverage Agreement includes not only the Named Member, but also:

11

A. Any official trustee, director, officer, or employee of the Named Member while acting within the scope of his or her duties as such; any volunteer acting for or on behalf of the Named Member, provided said individual has been authorized to act on behalf of the Named Member by an official, director or supervisory officer of the Named Member; and any person, organization, trustee or estate to whom the Named Member is obligated by a Covered Contract to provide coverage such as is offered by this Coverage Agreement but only in respect to operations by or on behalf of the Named Member, and only to the extent called for in the Covered Contract, but in no event for greater coverage than is otherwise afforded by this Coverage Agreement. The term "Covered Contract" means that part of any contract or agreement that is usual and customary to the Member's operations under which the Member assumes the tort liability of another party to pay Money Damages because of Bodily Injury or Property Damage to a third party, provided such contract or agreement is executed prior to the Bodily Injury or Property Damage and only to the extent allowed by law. Tort liability means liability that would be imposed by law in the absence of any contract or agreement.

B. [related to automobile liability] . . .

The inclusion hereunder of more than one Member shall not operate to increase IRMA's limits of liability.

The Law Enforcement Liability section of all three policies provides:

12

SECTION III - LAW ENFORCEMENT LIABILITY

1. COVERAGE AGREEMENT

A. IRMA hereby agrees, subject to the limitations, terms and conditions hereunder mentioned, to pay on behalf of the Member all sums which the Member shall be obligated to pay as Money Damages by reason of liability imposed upon the Member by law or assumed by the Member under a Covered Contract, by reason of Personal Injury, Bodily Injury or Property Damage that is caused by an Occurrence as defined in this section.

The policies define "Occurrence" as

an accident or a happening or event or a continuous or repeated exposure to substantially the same harmful conditions, including those arising out of Products Liability Completed Operations or Incidental Malpractice, that results from the conduct of Law Enforcement Duties and which results in Bodily Injury, Personal Injury or Property Damage during the Agreement Period.

(Emphasis supplied.) Finally, "Law Enforcement Duties" are defined as "any of the duties or obligations performed or fulfilled by or for, or authorized by, any Law Enforcement Agency of the Named Member. . . ."

The parties do not dispute that Harrison was an employee of Stephens County when he shot Ayers, and IRMA argues that regardless of any other policy language, Harrison was not a "member" covered under the Habersham and Rabun County

13

policies because he was neither an "official, trustee, director, officer or employee" of Habersham or Rabun County acting within the scope of his duties when he shot Ayers, nor a volunteer authorized to act for or on behalf of Habersham or Rabun County. Ayers concedes that Harrison was not an official, trustee, director, or employee of these counties, but argues that he was acting on their behalf as an "officer" or a "volunteer."

"Dictionaries may supply the plain and ordinary sense of a word." *Market Place Shopping Ctr. v. Basic Bus. Alternatives, Inc.*, 213 Ga. App. 722 (1) (445 SE2d 824) (1994). Further, "the context in which a contractual term appears always must be considered in determining the meaning of the term." *Archer W. Contrs., Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (2) (735 SE2d 772) (2012). Here, while the policies do not define "officer," looking at the contracts as a whole and the word in context, surrounded as it is by "official trustee, director," and "employee," it is clear that "officer" does not mean "law enforcement officer." "Black's [Law] Dictionary . . . defines 'officer' in part as follows: 'An "officer" is distinguished from an '"employee" in the greater importance, dignity, and independence of his position, in requirement of oath, bond, more enduring tenure, and fact of duties being described by law." *Fowler v. Mitcham*, 249 Ga. 400, 401-402 (291 SE2d 515) (1982).

14

Further, Harrison was not a volunteer. In *Alea London Ltd. v. Lee*, 286 Ga. App. 390, 393 (1) (649 SE2d 542) (2007), we noted that "Merriam-Webster's dictionary defines a volunteer in pertinent part as 'a person who voluntarily undertakes or expresses a willingness to undertake a service: as … one who renders a service or takes part in a transaction while having no legal concern or interest.' Merriam-Webster's On-Line Dictionary, http://www.m-w.com/dictionary/volunteer." As Merriam-Webster's succinctly puts it, a volunteer is "a person who does work without getting paid to do it." Harrison was not working as a "volunteer" for Habersham or Rabun Counties; he was being paid a salary by his employee, Stephens County.

Because Harrison was not an insured "Member" under the Habersham and Rabun County policies, the policies do not provide liability coverage for his law enforcement activities that resulted in the occurrence at issue, and the trial court did not err in so holding.

2. Based on the conclusion in Divison 1 that Harrison is not an insured "Member" under the Habersham and Rabun County insurance policies, we need not address IRMA's other enumerations of merit.

*Judgment affirmed. Boggs and Branch, JJ., concur*.

15