**THIRD DIVISION**
**ELLINGTON, P. J.,**
**BETHEL, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 15, 2018**

# In the Court of Appeals of Georgia

A18A0391.  AMBERFIELD  HOMEOWNERS  ASSOCIATION, INC. v. YOUNG et al.

ELLINGTON, Presiding Judge.

A group of homeowners in the Amberfield subdivision in Gwinnett County filed this declaratory judgment action, seeking a declaration that an amendment to the governing documents of the Amberfield Homeowners Association, Inc., filed in June 2015 is null and void.[1] The amendment expressly authorized the Association to enter into an agreement with a nearby private swim and tennis club. Under the agreement, the club granted an easement giving the association's members the right to use the club's facilities as members. The agreement provided that club fees would be added

---

[1] The plaintiff homeowners are Steve Young, Randal Tart, David Chappelle, Eileen Chappelle, William Kooymans, Joyce Kooymans, Millard Wilkinson and Bobbie Wilkinson.

to the assessments collected from members by the Association and would in turn be remitted by the Association to the club.

The complaint alleged, inter alia, that the amendment to the governing documents was void on its face, alleging specifically that Georgia law and the governing documents of the Association do not permit the Association to force the plaintiffs, without their consent, to be members of a private club that is not part of the Association and do not permit the Association to set itself up as a debt collector for a third party entity over which the Association has no legal control or authority.[2]

The parties filed cross-motions for summary judgment. The trial court determined that the amendment was void and granted the plaintiffs' motion for summary judgment. The trial court also denied the Association's cross-motion for summary judgment. The Association appeals, challenging both rulings. For the reasons explained below, we reverse.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[2] The complaint also alleged that the amendment was void because it was not approved by the number of members required by Georgia law and the governing documents.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c).

> [A] defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case. . . . Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010). When, as in this case, the parties file cross-motions for summary judgment, "each party must show that there is no genuine issue of material fact regarding the resolution of the essential points of inquiry and that each, respectively, is entitled to summary judgment; either party, to prevail by summary judgment, must bear its burden of proof." (Citation and punctuation omitted.) *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. 302 (780 SE2d 501) (2015). Moreover, "the declaration of a homeowner's association is considered a contract, and we therefore apply the normal rules of contract construction to

3

determine the meaning of the terms therein." (Punctuation and footnote omitted.) *Marino v. Clary Lakes Homeowners Assn., Inc.*, 331 Ga. App. 204, 208 (1) (770 SE2d 289) (2015).[3] Viewed in the light most favorable to the non-moving parties respectively, the record shows the following undisputed facts.[4]

A developer recorded the original declaration of covenants and restrictions for the Amberfield subdivision in July 1992, resulting in the creation of Amberfield Homeowners Association, Inc., a nonprofit corporation. The Amberfield declaration was submitted to the terms of the Georgia Property Owners' Association Act, OCGA § 44-3-220 et seq.[5] The Association filed an amended declaration in August 2011.

---

[3] *Ayers v. Assn. of County Commrs. of Georgia-Interlocal Risk Management Agency*, 332 Ga. App. 230, 235 (1) (771 SE2d 743) (2015) ("[A] court may not strain to find an ambiguity [in a contract] and must enforce an unambiguous contract as written.") (citation and punctuation omitted); *Laun v. AXA Equitable Life Ins. Co.*, 311 Ga. App. 646, 648 (1) (716 SE2d 760) (2011) (If the language of an agreement is "clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the court.") (citation and punctuation omitted).

[4] The trial court took judicial notice of the documents filed in the real property records. See OCGA § 24-2-201 (judicial notice of adjudicative facts).

[5] The Property Owners' Association Act applies only if an association elects to have it apply. OCGA §§ 44-3-222 ("Any declaration or amendment intending to bring or avail a development of the benefits and provisions of this article shall state an affirmative election to be so governed."); 44-3-235 ("This article shall apply to all property which is submitted to this article."); *Hayes v. Lakeside Village Owners*

4

Prior to June 2015, membership in a nearby swim and tennis club, owned and operated by The Fields Swim & Tennis Club, Inc., was available to the all residents in the Amberfield community and other communities. Some Amberfield residents had elected to join the Fields Club and paid club dues, but the plaintiffs/appellees in this case were not members of the Fields Club.

In March 2015, the Association distributed a ballot to its members, stating that the Board proposed the adoption of an amendment to the declaration which, "once adopted by the members and recorded" in the land records would "authorize [the Board] . . . to enter into a recorded Easement and Cost Sharing Agreement with The Fields Swim & Tennis Club" to "establish[ ] a user benefit" for the owner of each lot "allowing continued use and enjoyment of the Basic Club Amenities other than the Tennis Amenities (the "Basic Membership") [and to] establish[ ] an obligation of each Owner to pay periodic Club Fees." The ballot stated that club fees would be payable by the owners to the Association in the same manner as assessments under the declaration and would be payable by the Association to the club. Two of the

*Assn., Inc.*, 282 Ga. App. 866, 871-872 (5) (640 SE2d 373) (2006) (Where a restrictive covenant was recorded before the Property Owners' Act became effective and was not amended to submit the Association to the Act, the provisions of the Act did not apply.).

appellees deposed that in connection with the proposed amendment they received information that the Fields Club was struggling financially because of declining membership.

On June 15, 2015, the president of the Association certified under oath that the balloting had been conducted according to Georgia law and the governing documents and that the proposed amendment had been approved by at least 66 2/3 percent of the eligible vote, as required. The following day, the Association recorded an amendment to the declaration authorizing the Association to enter into the planned Easement and Cost Sharing Agreement with the Fields Club.[6]

The officers of the Association and the Fields Club executed the Declaration of Easement and Cost Sharing Agreement in December 2015 and filed it in the real property records. The Agreement expressly provided that the easement for the use of the Fields Clubs facilities would run with the land of homeowners' lots as well as with the Association's common areas.[7] In the event of a change in the ownership of

---

[6] According to the verified complaint, the plaintiffs in this case objected to the implementation of the June 2015 amendment on the basis that the Association incorrectly included votes from some who were ineligible to vote and incorrectly excluded some others on the basis that they were ineligible to vote.

[7] In detail, the December 2015 Agreement provided that the Fields Club,

a lot, the club membership of the selling owner would terminate and the membership in the Fields Club would "automatically transfer to the new Owner."

This suit followed in June 2016. Although the Association sought the June 2015 amendment purportedly to gain the authority to enter into the Declaration of Easement and Cost Sharing Agreement with the Fields Club, when the Association

---

as the owner of the Club Property, hereby grants, conveys, declares, creates, imposes and establishes a non-exclusive easement in perpetuity over and across a portion of the Club Property for the benefit of Amberfield Association and Riverfield Association and their respective members for the use and enjoyment of the Basic Club Amenities[.] . . . Said Basic Club Amenities Easement Area shall serve . . . Amberfield[.] . . . The Amberfield Association . . . [and its] "Authorized Users" . . . shall have the permanent right to use and enjoy the Basic Club Amenities Easement Area and the Basic Club Amenities installed thereon[.]

"Authorized Users" were defined essentially as each member of the Association, that is, the owner of an Amberfield lot, and certain specified family members, for as long as the member owned the lot. In addition, the Agreement provided that it establishes a perpetual non-exclusive easement for vehicular and pedestrian access for use of the club amenities. By virtue of being a member in the Fields Club, Amberfield homeowners would have voting rights and the same right to participate in the governance of the club as any other member.

In terms of the duration of the easement, the Agreement provides that it shall be binding upon and shall inure to the benefit of the parties and their successors and that "[a]ll of the easements, rights and privileges set forth herein shall be appurtenant to and shall run with the title to the Club [and] Amberfield . . . perpetually and are intended to be easements and not covenants restricting land to certain uses."

moved for summary judgment, it argued, inter alia, that it had not been required to amend the declaration in order to enter into the Agreement and include club fees in members' assessments.

On appeal, the Association returns to the threshold issue whether it needed the June 2015 amendment to have the authority to enter into the Declaration of Easement and Cost Sharing Agreement and to include Fields Club fees in members' assessments. Specifically, the Association contends that the declaration as amended in August 2011 granted it the authority to accept an easement against the land of another for the common benefit of Amberfield homeowners, to enter into a contract with another for the homeowners' common benefit, and to levy assessments for common expenses and that such authority was consistent with the provisions of the Georgia Nonprofit Corporations Code and the Property Owners' Association Act. The Association contends that the December 2015 Agreement inures to the common benefit of the homeowners in that, if membership in the Fields Club had remained voluntary, the entire subdivision might well have lost access to an amenity package of the sort commonly expected in suburban subdivisions and, therefore, stabilizing the Fields Club by mandating membership would help to maintain the property values of the entire subdivision.

8

As all parties acknowledge, both the Georgia Nonprofit Corporation Code and the Georgia Property Owners' Association Act give very broad powers to homeowners' associations, subject to the terms of the applicable governing documents. The Nonprofit Corporations Code provides that, unless the articles of incorporation provide otherwise, every nonprofit corporation "has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs," including "[t]o purchase, receive, lease, or otherwise acquire, own, hold, improve, use, and otherwise deal with real or personal property or any legal or equitable interest in property, wherever located[.]" OCGA § 14-3-302 (4). A nonprofit corporation also has the power "[t]o make contracts[.]" OCGA § 14-3-302 (7).

> The Property Owners' Association Act provides:
>
> Except to the extent prohibited by the instrument and subject to any restrictions and limitations specified therein, the association shall have the power to . . . acquire, lease, and own in its own name property of any nature, real, personal, or mixed, tangible or intangible; to borrow money; and to pledge, mortgage, or hypothecate all or any portion of the property of the association for any lawful purpose within the association's inherent or expressly granted powers.

OCGA § 44-3-231 (b).

The declaration in this case, as amended in August 2011, authorized the Association, acting through its board of directors, inter alia, "to acquire, lease, hold, and dispose of tangible and intangible personal property and real property[.]" By definition, an easement is an interest in real property, albeit a limited one.[8]

Despite the broad authority conferred on the Association by the Georgia Nonprofit Corporation Code, the Georgia Property Owners' Association Act, and the August 2011 declaration, the appellees contend that "the effort by [the Association] to force membership in the Fields Club cannot be legally justified[,]" because the obligation to pay mandatory dues to the Fields Club is a personal covenant that has nothing to do with the appellees' properties, the property of the Association, or the common property of the association.[9] This argument appears to invoke the touch-and-

---

[8] Daniel F. Hinkel, Pindar's Georgia Real Estate Law and Procedure (7th ed., updated April 2017) § 8-1 ("An easement has been defined as a right in the owner of one parcel of land, by reason of such ownership, to use the land of another for a special purpose not inconsistent with the general property in the owner. It is an interest in land owned and possessed by another, permitting its limited use or enjoyment without actual occupancy.") (punctuation and footnotes omitted).

[9] The amendment to the declaration expressly made club fees subject to the Association's collection rights under the Property Owners' Association Act, including, depending on the circumstances, the right to foreclose on a member's home if dues were not paid. See OCGA § 44-3-232 (liens for delinquent assessments).

concern doctrine.[10] Although Georgia precedent on this issue is scant, we conclude

[10] See Angela Gilmore, "Recreational Covenants and Residential Communities," 17 No. 4 Practical Real Estate Law 23, July 2001, pp. 26 (2001) ("The traditional view of 'touch and concern' requires that the burden of a covenant must touch and concern the property for the burden of the covenant to run with the land and that the benefit of the covenant must touch and concern the property in order for the benefit of the covenant to run with the land."); *Muldawer v. Stribling*, 243 Ga. 673, 675-676 (256 SE2d 357) (1979) (In a case concerning an agreement between the owners of adjacent tracts of real property that they would not utilize their properties for purposes other than single-family residences and that they would not make a request that the zoning classification of any part of the property be changed, the covenant was enforceable against the successor in title to one of the tracts because the covenant was intended to and did touch and concern the land and otherwise met the requirements for a covenant running with the land.); *Willcox v. Kehoe*, 124 Ga. 484 488-489 (1) (52 SE 896) (1905) (A covenant by a lessor to reimburse the lessee for repairs to be made at the option of the lessee did not touch or concern the land or have any relation to the interest conveyed and, therefore, did not constitute a covenant running with the land.); *Ricketson v. Bankers First Savings Bank, FSB*, 233 Ga. App. 11, 13 (1) (503 SE2d 297) (1998) ("When [a] covenant is of a collateral nature to the land, it is a personal obligation and does not run with the land. . . . In order that [an easement] may run with the land, its performance or nonperformance must affect the nature, quality, or value of the property demised, independent of collateral circumstances, or it must affect the mode of enjoyment, and there must be a privity between the contracting parties.") (citations, punctuation, and footnote omitted) ; *Murawski v. Roland Well Drilling, Inc.*, 188 Ga. App. 760, 763 (2) (374 SE2d 207) (1988) (finding that a restrictive covenant that gave an exclusive right to a water utility to provide water to a subdivision "touch[ed] and concern[ed] the land" of subdivision lots).

We note that the touch-and-concern doctrine has been superseded according to Restatement (Third) of Property (Servitudes) § 3.2 (2000, March 2018 update). The Restatement posits that "[t]he appropriate inquiry is whether the servitude arrangement violates public policy and the burden is on the person claiming invalidity to establish that the arrangement is one that should not be allowed to run with the

11

that a covenant to pay membership dues in a recreational club is not necessarily a personal covenant but can be found to touch and concern the land. See *Lowry v. Norris Lake Shores Dev. Corp.*, 231 Ga. 549, 550-551 (203 SE2d 171) (1974) (A provision in a deed requiring the grantees and their successors to pay an annual fee for beach privileges, regardless whether the grantees exercised the privileges, concerned the land and was enforceable against a subsequent grantee with notice of the provision.); *Lend A Hand Charity, Inc. v. Ford Plantation Club, Inc.*, 338 Ga. App. 594, 597-598 (2) (b) (791 SE2d 180) (2016) (A provision in the declaration of a property owners' association requiring lot owners to apply for membership in and pay dues for a recreational club, regardless whether the owners used the facilities, concerned the land and created a covenant running with the land binding on a

---

land." Id., comment *a*. It appears, however, that state courts have not abandoned the touch-and-concern inquiry. See *Wykeham Rise, LLC v. Federer*, 52 A3d 702, 714 (Conn. 2012) (Because the case presented no question whether covenants' restrictions on development of the plaintiff's land touched and concerned the land, the court therefore did not address the continuing viability of that formal requirement.); *In the Matter of El Paso Refinery, LP*, 302 F3d 343, 357 (5th Cir. 2002) (Because Texas had not yet followed the Restatement's adoption of a list of policy considerations to replace the touch-and-concern requirement, the court did not address the policy arguments advanced by the parties.); *Garland v. Rosenshein*, 649 NE2d 756, 758 (Mass. 1995) (not considering whether the touch-and-concern doctrine still applied after it was abandoned in the Restatement); see also Marcy Allen, "A Touchy Subject: Has the Restatement Replaced the Touch and Concern Doctrine with an Equally Troublesome Test?," 65 Baylor L. Rev. 1034 (2013) (focusing on Texas law).

subsequent grantee upon acceptance of the deed.).[11] Moreover, the agreed

consideration to be paid for an easement for the common benefit would constitute a

common expense to be borne by the homeowners collectively through the assessment

process.[12]

---

[11] See Angela Gilmore, "Recreational Covenants and Residential Communities," 17 No. 4 Practical Real Estate Law 23, July 2001, pp. 30-31 (2001) ("Generally, covenants that provide that owners pay to maintain common areas including recreational areas have been deemed to 'touch and concern' the land on the theory that the recreational facilities increase the value of the property owner's lot even if the property owner does not personally use the facilities. The courts have struggled more with covenants for recreational facilities that are structured not as fees assessed by homeowners' associations that maintain the recreational facilities, but rather as membership fees for recreational or country clubs. However, even the 'club' fee cases tend to support the view that such covenants touch and concern. Some courts, however, have ruled that such membership fees do not touch and concern."); Marcy Allen, "A Touchy Subject: Has the Restatement Replaced the Touch and Concern Doctrine with an Equally Troublesome Test?," 65 Baylor L. Rev., pp. 1036 (§ I), 1040 (§ II) (2013) (noting that, although many courts historically had used the touch and concern requirement to invalidate affirmative covenants that required the payment of fees or club dues, some courts have found that promises to pay dues to a club membership do touch and concern the land); Restatement (Third) of Property (Servitudes) § 3.2, comments *d* and *e* (2000, March 2018 update).

[12] The declaration also authorized the Association "to levy assessments (also known as annual dues) . . . for Common Expenses . . . [which] shall be used for the general purposes of promoting the recreation, health, safety, welfare, common benefit, and enjoyment of the Owners and Occupants of [Amberfield subdivision] Lots, as may be authorized by the Board." "Common Expenses" are defined in the declaration as "the expenses anticipated or actually incurred by the Association in carrying out its duties and responsibilities and maintaining, repairing, replacing, and operating the Common Property and the Landscape Easement Areas and otherwise

In addition, the appellees contend that they did not accept or utilize the easement and, therefore, that "the attempted imposition of Fields Club dues upon [them] was improper."[13] Given the breadth of the language in the declaration as amended in August 2011 that defines the Association's authority to act, however, we conclude that the Association had the authority to accept easements *on behalf of Amberfield homeowners* as members of the Association, not merely on behalf of the Association itself. Certainly, a declaration could be drafted that would require the approval of a specified percentage of the members before the Association could accept such an easement.[14] But the declaration in this case was not so drafted.

---

for the benefit of the Lots." See OCGA § 44-3-221 (3) ("'Common expenses' means all expenditures lawfully made or incurred by or on behalf of the association together with all funds lawfully assessed for the creation and maintenance of reserves pursuant to the provisions of the instrument.").

[13] See *Kesler v. Verner*, 161 Ga. 118 (1) (129 SE 843) (1925) (Although the owner attempted to convey a gift of land, the deed was insufficient to convey title where the grantee refused to accept the gift.); see also Daniel F. Hinkel, Pindar's Georgia Real Estate Law and Procedure (7th ed., updated April 2017) § 19-96 (Where the grantee declines to accept the conveyance of land and disclaims any title, the deed is ineffective.).

[14] See OCGA § 44-3-231 (f) ("Except to the extent otherwise expressly required by [specified statutes], by the instrument, by the articles of incorporation, or by the bylaws of the [property owners] association, the powers inherent in or expressly granted to the association may be exercised by the board of directors, acting through the officers, without any further consent or action on the part of the lot

14

Based on all of the foregoing, we conclude that, even without the June 2015 amendment to the declaration, the Association was authorized, for the common benefit of all homeowners in the subdivision, to accept an easement granting Amberfield homeowners access to recreational facilities, and to assess the homeowners, including the appellees, their pro rata share of the ongoing cost of the easement. One could infer from the evidence discussed above that the board of the Association accepted the specific easement at issue based on its determination that access to a desirable recreation club would benefit Amberfield homeowners collectively, by protecting property values throughout the subdivision,[15] that the

_____

owners."); Jay S. Lazega, et al., 1 Ga. Jur. Property § 6:100 (March 2018 update) (The Georgia Property Owners' Association Act "grants the board of directors the power to run the affairs of the association by authorizing the board, acting through the officers, to exercise all association powers without any further action or consent on the part of the lot owners unless expressly provided otherwise by law or in the association's legal instruments.").

[15] As one commentator has explained:

To make their residential communities more attractive to prospective buyers, developers are increasingly offering amenities to residents of the community. For example, developers may provide a country club, golf course, tennis courts, swimming pool, or recreation center for the use and enjoyment of the residents of the subdivision. Typically, to pay for the amenities, each home is assessed a fee for its proportionate share of the expenses. These fees are generally assessed in one of two ways.

Fields Club needed to increase membership to be financially viable, and that this could be accomplished if members of the Association were required, rather than merely invited, to join the Fields Club and pay club membership fees.

Under Georgia law, where the declaration governing a property owners' association "delegates decision-making authority to a group and that group acts, the only judicial issues are whether the exercise of that authority was procedurally fair and reasonable, and whether the substantive decision was made in good faith, and is reasonable and not arbitrary and capricious." (Citations omitted.) *Saunders v. Thorn*

---

> The first and most common way is to require all purchasers of lots in the subdivision to become members of a homeowners' association that maintains the recreational facilities. The homeowners' association is then given the right to charge members for the upkeep of the facilities. The second way is to require property owners to purchase memberships in a country club or sports club that owns and maintains the recreational facilities.

Angela Gilmore, "Recreational Covenants and Residential Communities," 17 No. 4 Practical Real Estate Law 23, July 2001, pp. 23-24 (2001). See Karen Ellert Peña, "Reining in Property Owners' Associations' Power: Texas's Need for A Comprehensive Plan," 33 St. Mary's L.J. 323, 332 (2002) (Property owners' associations "often tout special benefits such as private security through secured community grounds and private patrol services, and recreational facilities, including park grounds and swimming pools. The amenities offered by POAs enhance and preserve the owners' investment in their homes.") (footnotes omitted).

*Woode Partnership L.P.*, 265 Ga. 703, 704 (2) (462 SE2d 135) (1995).[16] In this case, the declaration delegated decision-making authority to the Association's board of directors.[17]

Because the Association already had the authority to accept the easement under the declaration as amended in August 2011, as we have explained, the issue whether the June 2015 amendment was procedurally defective is moot. Simply put, the declaration that the appellees prayed for in their petition for a declaratory judgment, that the June 2015 amendment is null and void, would not confer the ultimate relief they sought – freedom from being assessed a share of the ongoing expense to the

[16] See *Waller v. Golden*, 288 Ga. 595, 599 (2) (706 SE2d 403) (2011) (The trial court properly denied homeowners' claims against the property owners' association's board members where there was no evidence to establish that the board members were not acting in good faith when they authorized the expenditure of the association's funds for mature shrubbery to hide a pool built on another homeowners' property in pursuit of the reasonable goal of protecting the community aesthetic.); *King v. Chism*, 279 Ga. App. 712, 717 (3) (632 SE2d 463) (2006) (The trial court properly granted a property owners' association's motion for summary judgment where there was no evidence that its decision to tow a vehicle long abandoned in a common area was unreasonable or made in bad faith.).

[17] The declaration as amended in August 2011 defines the board of directors as "the elected body responsible for management and operation of the Association." See OCGA § 14-3-801 (a) ("Each [nonprofit] corporation must have a board of directors."); (b) (Except as provided in specified Code provisions, "all corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board.").

Association arising under the Declaration of Easement and Cost Sharing Agreement. Consequently, the Association was entitled to judgment as a matter of law on the appellees' demand for a declaratory judgment, and the trial court erred in denying its motion for summary judgment and granting the appellees' motion.[18]

*Judgment reversed. Bethel, J., and Senior Appellate Judge Herbert E. Phipps concur.*

---

[18] We are mindful that the burden of this easement on the subservient estate, that is, the Fields Club's property and amenities, is substantial. Presumably, the Fields Club's voluntary members are not granted an easement in perpetuity but rather receive time-limited contractual rights that are governed by the rules that pertain to ordinary contracts. But the question whether the Fields Club might at some point decide its bargain with the Association came at too dear a price is not before us.