**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**August 26, 2022**

# In the Court of Appeals of Georgia

A22A0715. HAMILTON MILL THEATRE DEVELOPMENT, LLC
v. REGAL CINEMAS, INC.

HODGES, Judge

This case involves a lease dispute between a landlord, Hamilton Mill Theatre Development, LLC ("Landlord") and its tenant, Regal Cinemas, Inc., which arises from the disruption caused to the film industry as a result of the COVID-19 pandemic. The parties disagree as to how much rent is owed to Landlord pursuant to the lease agreement between them. Landlord sued Regal claiming an underpayment of rent both before and during the pandemic.[1] The parties filed cross-motions for summary judgment, and the trial court granted Regal's motion and denied Landlord's

---

[1] Landlord initially also brought a claim for eviction, but that claim was dismissed by the trial court and Landlord does not appeal that ruling.

motion, concluding that Regal did not underpay rent to Landlord. We agree, and affirm the trial court.

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9–11–56 (c). Thus, to prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, so that the party is entitled to judgment as a matter of law[.] A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims. Thus, the rule with regard to summary judgment is that a defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case. Where a defendant moving for summary judgment discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9–11–56 (c) have been met. In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 623-624 (1) (a) (697 SE2d 779) (2010).

So viewed, the record demonstrates that Landlord and Regal's predecessor entered a lease agreement in 2007. The lease provides that "[t]he Demised Premises is undeveloped on the Effective Date of this Lease but Landlord shall cause a theatre building containing approximately 51,533 square feet of Floor Area (defined below) (**"Theatre Building"**) and related improvements to be developed and constructed on the Demised Premises . . . ." Under this lease, Regal paid Landlord rent based upon certain earnings. Specifically, the lease provides that:

> [Regal] agrees to pay "Rent" on a monthly basis to the Landlord in lawful money of the United States in the amount of fifteen percent (15%) of the total of (i) [Regal's] **"Gross Box Office Receipts:** and (ii) [Regal's] **"Concession Receipts"** during the Lease Term . . . . [Regal] shall furnish to Landlord along with the Rent payment for each month, a statement itemizing in reasonable detail all Gross Box Office Receipts and Concession Receipts . . . .

The lease defines "Gross Box Office Receipts" as "the aggregate gross box office receipts from the sale or issuance of theatre tickets for the admission to the theatres for viewing of motion pictures or other forms of entertainment." "Concession Receipts" is defined as

3

the aggregate receipts from the sale of candies, popcorn, soft drinks, confections, and any other food and drink items, records, books, magazines, toys, novelties, video tapes, video disks, audio games, T-shirts and similar items, screen advertising, receipts from video games and any and all other merchandise sold in the Theatre Building or otherwise in the Demised Premises.

The lease contains a limitation on the business operations of Regal. It states that "[s]ubject to the provisions of this Lease, the Demised Premises shall only be used for the following **("Permitted Use")**: the conduct of a fourteen (14) screen motion picture theatre for the presentation of first run motion pictures and providing a first class family operation (but not for operation of a 'dollar' or 'discount' theatre) . . . ." The parties agree that presentation of first run motion pictures means newly released blockbuster movies. The lease further provides that

> [Regal] covenants, at its sole cost and expense, at all times during the Lease Term  . . . [t]o use the Demised Premises only for the Permitted Use as set forth above and for no other purpose; to operate its business in the Demised Premises for the display on all fourteen (14) screens in the Theatre Building of first run movies and providing a first class family operation; and to conduct its business at all times in a high grade ]and reputable manner so as to produce the maximum volume of Gross Box Office Receipts and Concession Receipts[.]

Despite the above language, the lease does provide for certain contingencies.

[Regal] shall continuously operate the Demised Premises for the Permitted Use during the Lease Term . . . . If at any time after the expiration of the tenth (10th) full lease Year of continuous operation of the Demised Premises for the Permitted Use . . .[Regal] desires to cease operating the Demised Premises . . . and to "go dark" or to change the Permitted Use, then, provided [Regal's] desire is based upon material adverse changes in the financial performance of the first run movie theatre operated by [Regal] on the Demised Premises and [Regal] provides reasonably satisfactory evidence thereof to Landlord, [Regal] shall be entitled to "go dark" or, if authorized under this Lease, to change the Permitted Use by giving Landlord written notice of [Regal's] election. Notwithstanding the foregoing, [Regal] shall not be entitled to "go dark" or, if authorized under this Lease, to change the Permitted Use until the Market Base Rent Rate (defined below) has been determined in accordance with the procedure set forth below, and [Regal] gives Landlord prior written notice of the month during which [Regal] will commence paying the Fixed Base Rent (defined below) . . . [Regal] shall be entitled to "go dark" on the first (1st) day of the month during which [Regal] commences paying such Fixed Base Rent. Because the Rent due under this Lease is Percentage Rent and Landlord will not receive any Percentage Rent for any months during which the Demised Premises is not being operated for the Permitted Use, [Regal] acknowledges and agrees that [Regal] shall not be entitled to "go dark" for any period of time after [Regal's] election but prior to establishing the Market Base Rent Rate and commencing to pay the Fixed Base Rent as provided herein. . . . . If [Regal] gives Landlord notice of [Regal's] desire to

5

establish the Market Base Rent Rate in order to "go dark" or, if authorized under this Lease, to change the Permitted Use, then at any time thereafter Landlord shall be entitled to terminate this Lease and reclaim possession of the Demised Premises . . . by not less than thirty (30) days prior written notice to [Regal]. If Landlord does not elect to terminate this Lease and reclaim possession of the Demised Premises within such thirty (30) day period, [Regal] shall be entitled, at its election, to "go dark" or, if authorized under this Lease, to change the Permitted Use. . . .

The lease does not define the term "go dark." It does, however, define "Market Base Rent Rate," which is

Landlord's reasonable determination of the base rental rate per rentable square foot then being charged for first class retail space of comparable size within a ten (10) mile radius of the Demised Premises, excluding the Mall of Georgia ("Market Area"). Landlord shall provide written notice of the Market Base Rent Rate reasonably determined by Landlord not less than twenty (20) days after [Regal] gives Landlord written notice of [Regal's] desire to "go dark."

Once Market Based Rent has been established, that rate is multiplied by the square footage of the property to establish the Fixed Base Rent.

The lease also contains a force majeure clause, which provides that

[i]f either party to this Lease, as the result of any (i) strikes, lockouts or labor disputes, (ii) inability to obtain labor or materials or reasonable substitutes therefor, (iii) acts of God, governmental action, condemnation, civil commotion, fire or other casualty, or (iv) other conditions similar to those enumerated in this Section beyond the reasonable control of the party obligated to perform (other than the failure to timely pay monies required to be paid under this Lease), fails punctually to perform any obligation on its part to be performed under this Lease, than such failure shall be a **"Force Majeure"** event and shall be excused and not be a breach of this Lease by the party in question, but only to the extent occasioned by such event; and for the period for the commencement and completion thereof shall be extended for a period equal to such delay.

The dispute here first arose at the beginning of the COVID-19 pandemic. In late March 2020, Regal sent a letter to all of its landlords nationwide informing them that all of its theatre operations were being ceased due to the pandemic and that it was uncertain when operations could resume. It requested that landlords contact it to discuss "working together to address the challenges we face." In May of 2020, after the governor lifted the stay-at-home order in Georgia which shuttered movie theatres, Landlord sent a letter to Regal finding Regal in breach of the lease for, among other things, failing to resume operations for a "Permitted Use" upon the government permitting theatres to operate again. The letter further stated that Landlord found

Regal's decision not to resume operations to be an election to "go dark" and that it intended to hold Regal responsible for Fixed Base Rent pursuant to the lease. Landlord sent an additional letter in June of 2020, which stated that Fixed Base Rent was being established starting May 1, 2020.

According to Regal, it did not re-open in May 2020 when the government permitted theatres to open again in Georgia because it still had public safety concerns and because there were no new movies being released for it to show in its theatres. Regal briefly re-opened the theatre at issue in August 2020 in anticipation of Labor Day movie releases, but closed again in October 2020 because movie studios pulled or pushed back new movie release dates and there were again no new movie releases to display. The theatre at issue re-opened in May 2021.

Despite the demand letters, Regal continued to pay rent based on Gross Box Office Receipts and Concession Receipts, not Fixed Base Rent, and Landlord filed suit. Although Landlord's initial suit only sought to recover Fixed Base Rent starting May 1, 2020, Landlord amended the complaint to allege that, as a result of a marketing agreement with its beverage supplier, Regal had been underpaying Concession Receipts under the lease even prior to the pandemic. Landlord moved for partial summary judgment on its Fixed Base Rent claim, and Regal cross-moved for

8

summary judgment on all of Landlord's claims. The trial court granted Regal's motion for summary judgment and denied Landlord's partial motion, and Landlord filed this appeal.

1. Landlord contends that the trial court erred in granting summary judgment to Regal and denying summary judgment to it because the failure to continuously operate the theatre was a material breach that triggered Fixed Base Rent and was not excused by the force majeure clause. We disagree.

Georgia law is clear that

[t]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

(Citation omitted.) *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 638 (1) (786 SE2d 250) (2016). Moreover, "[a]s a general rule the provisions of a lease will be

9

construed against the lessor." *Rainbow USA, Inc. v. Cumberland Mall, LLC*, 301 Ga. App. 642, 644 (1) (688 SE2d 631) (2009).

Here, the legal dispute concerns whether conditions have arisen which permit Landlord, pursuant to the lease terms, to collect Fixed Base Rent as opposed to rent based on a portion of Gross Box Office Receipts and Concession Receipts.[2] Obviously the resolution of that question here will make a significant difference in the rent owed, especially during the period of time when the theatre was not displaying movies.

The lease between the parties required Regal to continuously operate the theatre for the Permitted Use of being a "fourteen (14) screen motion picture theatre for the presentation of first run motion pictures and providing a first class family operation (but not for operation of a 'dollar' or 'discount' theatre)[.]" The parties agree that "first run" and "first class" are terms of art in the movie industry which mean that the theatre must show newly-released blockbuster movies that are generally not available elsewhere and to do so at the beginning of the movie's release.

---

[2] Landlord admits in its reply brief that Regal has been paying an average of $400 per month in Concession Receipts during the times when it has not displayed movies, though clearly no Gross Box Office Receipts accumulated during that time. Landlord states that previously, Regal had been paying an average of $50,000 per month in rent.

10

Accordingly, the failure to display these types of movies would typically be a default of the lease's requirement.

The lease, however, contains a force majeure clause which, as quoted above, excuses performance if either party to the lease,

> as the result of any . . . inability to obtain labor or materials or reasonable substitutes therefor . . . (other than the failure to timely pay monies required to be paid under this Lease), fails punctually to perform any obligation on its part to be performed under this Lease, then such failure shall be a **"Force Majeure"** event and shall be excused and not be a breach of this Lease by the party in question . . . ."

The parties agree that Regal could not meet its obligation to continuously show first run movies during a time when movie studios were not releasing new movies. They also agree that even once the government permitted theatres in Georgia to resume operations, the movie studios were not yet releasing new movies and, thus, Regal could not resume its operation of displaying first run movies. They also do not dispute that Regal resumed its operations at times when the studios released new movies. Accordingly, despite its enumeration claiming breach, Landlord has substantively admitted that Regal's obligation under the lease to continuously operate

11

as a first run theatre was excused by the lease's force majeure clause because Regal was unable to obtain the necessary materials to perform – newly released movies.[3]

Landlord, however, seeks to use this inability to operate as the equivalent of Regal's election to "go dark" so as to trigger Fixed Base Rent under the lease. The definition of "go dark" seems highly important to this lease, but it is never defined. Nonetheless, we do not need to rely on the definition of "go dark" to resolve this dispute because here the requirements of imposing Fixed Base Rent have not otherwise been satisfied. The lease specifies the process by which Fixed Base Rent is due following the establishment of Market Based Rent. It provides that

> [i]f. . .[Regal] *desires to cease operating* the Demised Premises . . . and to "go dark" . . . , then, provided [Regal's] desire is based upon material adverse changes in the financial performance of the first run movie theatre operated by [Regal] on the Demised Premises and [Regal] provides reasonably satisfactory evidence thereof to Landlord, [Regal] shall be entitled to "go dark" . . . *by giving Landlord written notice of [Regal's] election.* (Emphasis supplied.)

---

[3] Interestingly, Landlord has not treated Regal's closure of its operation during the time when the government prohibited theatres from operating in Georgia to be an election to "go dark" given that it only seeks to impose Fixed Base Rent once that order was lifted. Impliedly, this demonstrates an acknowledgment that ceasing operations due to a force majeure event is not the equivalent of electing to "go dark."

Here, Regal never gave Landlord any written notice of an election to "go dark," a fact which Landlord admits. Indeed, the undisputed evidence demonstrates that Regal did not *desire* to cease its operations because whenever circumstances permitted Regal to operate its Permitted Use of displaying first run movies, it did so. In other words, Regal's failure to show first run movies was the result of the force majeure clause excusing Regal of its obligation to continuously operate its theatre for first run movies, not the result of its (non-existent) written election to "go dark."[4]

One of the parties to this lease must absorb the burden of the financial impact of the unexpected global pandemic. The terms of this lease put that burden on Landlord, who will receive significantly less rental income than usual. However, we must construe the unambiguous terms of the contract as written. Indeed, this lease did provide for minimum rental payments which would have protected Landlord in such a situation, but that provision expired by its own terms long before the pandemic

---

[4] Contrary to Landlord's argument, such a holding does not stand for the proposition that we are allowing a force majeure event to excuse the payment of rent. Regal has always been required to pay rent based on Gross Box Office Receipts and Concession Receipts as provided in the lease, even though that amount was de minimus during the time when Regal could not display first run movies.

began.[5] Here, there has not been a written election by Regal of a desire to "go dark" and, thus, Landlord was not entitled to unilaterally impose Fixed Base Rent on Regal. The trial court did not err in granting summary judgment to Regal and denying it to Landlord on this basis.[6]

2. Next, Landlord contends the trial court erred in granting summary judgment to Regal on its underpayment of rent claim because certain sums received pursuant to a marketing agreement with Regal's beverage supplier constituted Concession Receipts which should have been included in calculating the rent owed to Landlord. We disagree.

---

[5] The lease provides that "in the event that the Rent payable by [Regal] under Section 4.1 (a) or Section 24.6 of this Lease is less than Sixty-Two Thousand Dollars ($62,000.00) per month **("Minimum Monthly Rent")**, [Regal] shall pay on the due date of such Rent an additional amount equal to the difference between the Minimum Monthly Rent and the amount of Rent otherwise due under this Lease **("Minimum Monthly Rent Deficiency")**. This obligation shall commence for the third (3rd) full month of the Lease Term following the Date of Occupancy and shall continue for the remainder of the thirty-six (36) month term of [Landlord's loan]. . . . Following such thirty-six (36) month term of the [loan], [Regal] shall no longer be obligated to pay the Minimum Monthly Rent if the Rent otherwise payable under this Lease is less than the Minimum Monthly Rent.

[6] Regal argues that its obligation to pay Fixed Base Rent was also not triggered because of Landlord's failure to properly invoke that provision of the lease due to its failure to calculate Market Rate Rent based on the relevant geographical area. In light of our disposition in this division, we need not address this issue.

Regal had a national Marketing Advertising and Brand Presence Agreement with its beverage supplier (the "Marketing Agreement"). The Marketing Agreement provided that "[Regal] has the ability to provide the following beverage availability, merchandising, promotional, and advertising rights to the [beverage supplier] and is willing to do so . . . ." Specifically, the Marketing Agreement granted the beverage supplier the right to be the exclusive supplier of beverages in all of Regal's theatres nationwide. Regal agreed to purchase fountain syrup at the rate the supplier established for national chain accounts. Regal agreed that no competitor's logos or advertising would be displayed in its theatres. The Marketing Agreement provided for the display of the supplier's advertisements and marketing in the theatre lobbies as well as on-screen before the display of movies.

In consideration for this exclusivity and the marketing opportunities provided by Regal, the supplier agreed to pay a specified amount in "Media Support Funding" for every gallon of fountain syrup Regal purchased from the supplier. This was based off the amount purchased by Regal for sale in "Theatres," which is defined as "*all venues*, the primary business of which is feature films and other filmed entertainment that are owned by [Regal] or managed, operated, licensed, franchised or otherwise

15

controlled, directly or indirectly, by [Regal] or any of its subsidiaries *in the 50 United States and the District of Columbia*[.]" (Emphasis supplied.)

Landlord claims these payments should be considered Concession Receipts under the lease. It seeks to obtain 15 percent of the Media Support Funding received by Regal that is attributable to the gallons of fountain syrup purchased by the specific theatre at issue. These sums, however, do not meet the plain definition of Concession Receipts under the lease, which is:

> *the aggregate receipts from the sale of* candies, popcorn, *soft drinks*, confections, and any other food *and drink items*, records, books, magazines, toys, novelties, video tapes, video disks, audio games, T-shirts and similar items, screen advertising, receipts from video games and any and all other merchandise *sold in the Theatre Building* or otherwise in the Demised Premises. (Emphasis supplied.)

Although the payment of Media Support Funding is calculated by the amount of gallons of fountain syrup *purchased* (not sold) by Regal nationally, it is not money paid to Regal on account of the sale of any of the items listed in the definition of Concession Receipts. It is money paid to Regal to provide its beverage supplier with exclusivity in the provision of beverages and beverage marketing/advertising.

Contrary to Landlord's argument, Section 4.3 of the lease does not change the analysis. That section provides that,

> [Regal] covenants and agrees with the Landlord that it will keep and use separate records and books of account of all such business and that all receipts of every kind whatsoever shall be duly recorded. The Landlord shall have the right by its representative or agent, at any reasonable business time or times, to audit the Tenant's Gross Box Office Receipts and Concession Receipts for each Lease Year on file for a period of not less than two (2) years after the expiration of each Lease Year (or longer during the course of a dispute or audit commenced within such two-year period) and will afford the Landlord, or Landlord's agent, the privilege during said period to examine and copy such records (whether in paper, electronic or other format) . . . .

The mere fact that Regal agreed to record "all receipts of every kind whatsoever" does not expand the definition of "Concession Receipts" to include the payments received by the beverage supplier. Nothing about the plain language of the definition of "Concession Receipts" or Section 4.3 can be interpreted to provide such an expansion, and we must interpret the contract as written, especially considering that we interpret the language against Landlord. See, e.g. *Rainbow USA*, 301 Ga. App. at 644 (1). The trial court did not err in granting summary judgment to Regal for

Landlord's claim for underpayment of rent based on the sums received by Regal under the Marketing Agreement.

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*